**EXHIBIT A**

## SENATE COMMITTEE ON BANKING, FINANCE & INSURANCE

### Oversight Hearing:  Department of Insurance

#### November 21, 2005
#### Sacramento, CA

#### Senator Jackie Speier, Chair

**SENATOR JACKIE SPEIER, CHAIR:** _____ January of next year.  As noted in the background paper, the hearing now brings to a total of eight oversight hearings that we have had since I took over as chair of this committee back in 1999.

I want to thank Senator Cox, the committee's vice-chair, in particular, for joining us today.  Both during his time in the state Assembly when he served on the Assembly Insurance Committee, and since joining this committee, he has regularly attended these oversight hearings that, as many of you know, are really the core of the Legislature's duty to the public.

We have many subjects on our agenda today.  Last time we heard about the Conservation Liquidation Office.  Today we're going to hear about the administrative apparatus of the department.

I should note that audit reports over the years recommended substantial upgrades to the department's information technology infrastructure.  I understand that many of these improvements have been implemented and we want to hear about them this morning.

We also are here to find out how the Legislature can assist the department to stay on top of the department's workload.

We will have a discussion on the consumer services and market conduct branch of the department.  We'll spend some time talking about auto repair.  We'll

G&C 00656

then examine the current status of consumer complaints after the 2003 wildfires, and the settlement of a disability insurer's market conduct exam. We'll then turn to the topic of enforcement of the Insurance Code, and we'll focus on enforcement of the fraud statutes. We'll end with an evaluation of the financial surveillance branch and determine what tools we need to provide to the analysts to help them do their jobs better.

I want to request of all witnesses, that they keep their comments brief and to the point. And while the agenda suggests that we will be here until 3:00, it is certainly my hope that we will complete this hearing before then, particularly since I have a sick child at home and would like to get back to the Bay Area.

So, with that, Senator Cox, do you have some opening comments?

**SENATOR DAVE COX:** I do. Thank you very much, Madam Chair. And thank you for scheduling this oversight hearing. It's certainly critical for the Legislature to perform its oversight functions so that we might ensure accountability of state government to Californians as well as make informed policy decisions.

Madam Chair, I wish to thank your staff for the development of today's agenda. I wish to thank Commissioner Garamendi, as well, for making himself available to the committee today. And I trust through his cooperation we'll gain a better understanding as to how the Department of Insurance works and where it can be improved.

And the Commissioner may recall, Madam Chair, that during our hearing last May, I had a number of questions regarding the department and its operations, and I believe those concerns need to be resolved.

I have some questions about the department's $28 million surplus, scheduled $28 million surplus, and I understand now that has, in fact, been spent and that you're contemplating an increase in assessments by some $7 million for next year.

Madam Chair, I also have concerns about the department's inability to closeout longstanding backlog of consumer complaints; concern about the department's inability to focus antifraud efforts to gain more convictions; and I have concerns about the department's inability to license new products in a timely manner.

It's my hope, Mr. Commissioner, that you and your staff, this morning, can provide an insight as to how the surplus that I mentioned was spent, and why the

department might be seeking to increase assessments.

Madam Chair and Mr. Commissioner, I also remain concerned about the department's threatening letter to agents and brokers requesting what I consider to be an overly broad, unspecified information about their disclosure.

So Madam Chair, I have questions about the department's legal authority for that threat; I have questions concerning the disposition of the documents generated by the agents and brokers who did in fact comply with the letter.

But I thank you. This morning I look forward to the hearing. And I appreciate you calling it, Madam Chair, so we can begin at your pleasure.

**CHAIR SPEIER:** All right. Mr. Commissioner, please come forward. We welcome you. Thank you for joining us. Do you have opening comments you'd like to make?

**JOHN GARAMENDI, INSURANCE COMMISSIONER:** Since this is the continuation of the previous hearing, we decided not to make additional comments. The earlier comments stand, and we're here to answer whatever questions you and your staff may have of us. You've presented written questions and we're prepared to deal with those, so we're at your pleasure.

**CHAIR SPEIER:** All right. Very good. Let's then move right to the administrative and licensing service's function. Mr. Ward is here, as is, former Acting Commissioner, Clark Kelso. We welcome you both. And from what I understand, you have some good news to relate to us.

**DENNIS WARD:** We believe so. Good morning, Madam Chair. Good morning, Senator Cox.

The California Department of Insurance has placed a high priority on using technology to improve the effectiveness, responsiveness, and efficiency of our operations. Among our most significant improvements to date, are those that we have made in the area of producer licensing.

Today, a person seeking an insurance agents license can use the CDI's website to search for pre-licensing education courses and providers, complete and submit their license application and pay the associated fees, and schedule and pay the fees for the license examination and reexamination if needed.

License applicants have benefited because the timeline for processing an insurance agents license in California has been reduced from six to eight weeks,

G&C 00658

down to two weeks. The CDI has benefited because we get fewer complaints about delays in issuing licenses and, more importantly, we've freed up five employees to redirect to other workload.

We have also automated the license examination process. We now deliver the license exam in a computer based format rather than a pencil and paper format. The computer format enhances the integrity of the examination, provides immediate feedback to the applicant, and reduces the staff time by one-half PY spent processing the examination results.

Beginning in January 2003, we began offering online services for our pre-licensing and continuing education providers. Education providers now have the ability to submit both their class presentation schedules and their course rosters through the CDI's website. This has reduced the timeline for processing the class presentation schedules from four weeks, to one week; reduce the timeline for processing course rosters from four weeks, to one week; and reduce the time for completed CE courses to be reflected on the agents CDI website record from three weeks, to immediately. The amount of staff time devoted to processing of the course presentation and rosters has been reduced by one PY.

We have also developed technology applications for other parts of the department's operations. For example, we've instituted an internet based system that allows companies or their designees to file suspected fraudulent claims with the department. This allows companies to submit online, rather than through the mail; it allows companies to check the status of their SFCs; saves data entry time for the fraud personnel; and provides opportunity for statistical analysis of the submitted SFCs.

We've also developed a system with the state of Florida and the state of Texas, what we call a multi-state annuity project that allows a company desiring to file a product for approval in those three states, to do so electronically and have it filed in all three states. And with the highest standards of those three states being used for the review of that product, and then once you have an approval, you're approved in three states, rather than one.

We also have established an internet-based annuity training report that lists all life agents who have completed the required annuity training. This allows companies a quick opportunity to go to our website to pull up all the agents that

G&C 00659

they have appointed, and determine which ones are authorized to sell annuities and those that are not.

We've also modified our examination tracking system pursuant to the Bureau of State Audits report and recommendation. This improves our tracking of cost and time spent on company exams, provides more efficient management reporting, and reduces manual operations through an automated system and procedures.

We've also made significant strides in improving our infrastructure. We've upgraded our network routers to replace end of life units and prepare the network to carry data, voice, and video. This reduces the risk of network failure, and allows for continued manufacturer maintenance and support.

We've also installed intrusion detection and prevention systems to block external attacks on the CDI network and its data repositories. This, of course, safeguards our network and servers, and helps to provide continued availability of applications and network resources.

We've also upgraded our network monitoring systems to capture and report on all network traffic, to improve analysis and management.

We've designed, configured, and installed a CDI email system with no single point of failure that provides 24 by 7 monitoring.

We've designed, configured, and installed an application to filter and block spam email messages. This improves staff productivity by eliminating the need to open, read, and deleting spam.

We've also developed and established a baseline budget pursuant to legislative and Department of Finance approval, to implement a technology refresh plan that ensures that our network and our PCs are maintained on a standard regular basis.

We've also got several things in the pike that we're excited about. One is, we're in the process of implementing a rate filing document imaging project. This will allow all rate filings to become image documents and be better accessed by the public. It improves document retrieval time by 50 percent; improves time for authorized CDI staff to obtain stored record rate filings from 24 to 48 hours, to one minute; and decreases use of office space for rate filing documents for public viewing.

We're also in the process of acquiring and automating our inventory system, creating a single database, rather than having multiple databases that we have to

G&C 00660

access to figure out what we have and where we have it.

We also have a project under the way to establish what we call an enterprise information portal. This basically is acquiring business intelligent software that allows us to reach out into the department, into the various data silos that the business units maintain, extract the information that we need, have it presented to us in a format that is how we need it to be presented, and should improve overall oversight of the insurance industry and our ability to analyze the information we have in-house.

We also have plans to implement, we're in the process of looking at bids now for replacing our telecommunications infrastructure. We have an end of life phone system, private phone system, that we acquired many years ago. We're having difficulty acquiring parts. We did a feasibility study report, and the recommendation was that we proceed with the voiceover IP alternative. And, we're excited about this for many reasons, not the least of which we think is as department relies heavily on its field force. The voiceover IP will increase the productivity of our field staff and also, it should enhance our ability at our call centers by allowing us to integrate the voice and data in a single way.

So those are some of the areas that we have focused on, Madam Chair. I'm happy to answer any question you might have.

**CHAIR SPEIER:** So what's the price tag on all of this?

**MR. WARD:** Each one, of course, has a different price. I can go down through some of those if you would like.

**CHAIR SPEIER:** Can you just ballpark it? I mean, this is all paid for by licensees and insurers, correct?

**MR. WARD:** That's correct. And the last two big projects, the enterprise information portal and the telecommunications replacement, are, by far, the two most expensive projects both exceeding....I don't have that figure right in front of me, but I believe it's somewhere in the neighborhood of $7- to $8 million.

And I would like to mention, Madam Chair, that we did meet with the industry prior to implementing both of those projects and explained that we were seeking PCPs. The reason we wanted to proceed with those projects. And the best that I'm aware of, there was industry support for that.

**CHAIR SPEIER:** The opportunity for someone to file a complaint online, does

that exist now?

**MR. WARD:**  I believe that they can go online and fill out the request for assistance form, yes.

**CHAIR SPEIER:**  So they fill out the request for assistance and then it is automatically directed to the proper division to handle?

**MR. WARD:**  I don't know if it's that intelligent, that it knows exactly where...

**CHAIR SPEIER:**  Well, if you fill it out online, what do you do with it?

**MR. WARD:**  It goes into the Consumer Service Division and into the hotline, into their database, into their workload review.  So depending on the nature of the complaint, it may be assigned to...

**CHAIR SPEIER:**  Some help is coming your way.

**MR. WARD:**  Good.  I need some help.

**TONY CIGNARLE:**  Madam Chair and member, Tony Cignarle, Consumer Services Division.

**CHAIR SPEIER:**  I understand you're sleep deprived these days, is that correct?  Congratulations.

**MR. CIGNARLE:**  For the most part, yes.  For good reasons.

To answer the question—yes.  In fact, when a consumer does file an interactive request for assistance on our website, it does go directly into our case tracking system and right to the specific bureau, whether it's a claims issue or a rating underwriting issue, to begin the assignment process and the handling and investigation of the complaint.

**CHAIR SPEIER:**  All right.  So, that's somewhat failsafe, and then there's a way of tracking that internally now, to determine how old a particular case is, correct?

**MR. CIGNARLE:**  Correct.  Whether a case came in through the internet, or was input directly by our staff, through coming in through the mail or by phone, it is all tracked and is all aged.

**CHAIR SPEIER:**  Okay.  Could you, Mr. Ward, just explain briefly the enterprise portal for everyone's benefit?  I think it's of great value, and I think it's worth spelling out a little bit.

**MR. WARD:**  Yes, I'd be happy to.  The department, like most government agencies, is a bureaucracy, and we have distinct units throughout the department

SENATE COMMITTEE ON BANKING, FINANCE & INSURANCE

spread up and down the state, each of which has kind of evolved on its own over time, and certainly not in a coordinated fashion with the rest of the units. Some are way ahead of others in terms of the level and use of automation. The end result of that is, that each of those units is performing something that's critical to oversight of the industry. But if you're sitting in a position such as, our chief deputy, or sitting, really, in another bureau in the department, trying to figure out everything that we might have in-house in the company, you basically have to spend your day finding out who to call; finding out what they may have, knowing how to ask the question to make sure that if they have the information they could identify it and pull it out for you, and then, you have to analyze it. And, that may involve a substantial amount of time or it may not. You may seek a need, assistance from our IT staff to develop reporting of it.

The enterprise information portal is, essentially, taking that data, identifying that data, and having the ability to reach out and grab it for you electronically and present it in a way that you've outlined it to be presented.

You know, there's a software product that will assist anyone in reaching into databases to pull out and extract data. The weakness, of course, in that process is, is if you don't have the data stored electronically, you're not going to be able to retrieve it, of course.

**SENATOR SPEIER:** Now you can retrieve it, but can you modify it? Can you tinker with it?

**MR. WARD:** You can. Once you have hold of that data, you can do things with it. I mean, whatever processes that you can develop through an application, could be used to tweak it in the sense of....you know, I'm not quite sure if I have an example of where you would do that, but certainly once you have data...

**CHAIR SPEIER:** Do you see where my concern is going, though?

**MR. WARD:** Yes.

**CHAIR SPEIER:** My concern being, there's data. Someone who may not have the most benign of interests, is going to take that data, tweak it, and create a different result.

**MR. WARD:** Understood. And I should clarify what I was referring to, would be basically where you have a copy of what is already in the file and then you do something else with it. The actual official record, the official data, would not be,

SENATE COMMITTEE ON BANKING, FINANCE & INSURANCE

unless through security review, you would not be able to write over it, to alter it, to change it in any way. It would be read only, essentially, is what the process would be.

**RICK BAUM:** Senator, I'm Rick Baum, chief deputy. The real strategy behind having this system is primarily as a management tool.

And as Dennis pointed out, when we were in office the first time, and then over the years, we were very cautious of the silo effect that happens within any agency. And the goal here is, to give top management and your key managers a vehicle whereby I, for example, can come into the office in the morning and if Senator Speier or Senator Cox has written a note or made a question as to, where do you stand on your backlog of cases, or where do you stand on the number of filings you have here, that we have a system that we have created, or in effect, a reporting system, at the highest level, that can track that information. And from my perspective and the Commissioner's perspective, it's primary purpose is one of creating accountability.

**CHAIR SPEIER:** Well, so the right hand knows what the left hand is doing.

**MR. BAUM:** It's a vehicle through which we can look at the entire enterprise and have real accountability. And the information Dennis was talking about, the data remains in the units with the appropriate security protections and so forth that it needs to have, but what is coming up to us is, is the series of reports that drill down into that data and can show me, on a real time basis, how these cases are tracking.

The very information, for example, that Tony was describing, I don't need to call down to Tony and say, "Can you call up what your number of cases are?" We will have a report that will show up right there for the Commissioner, or for me, or for Dennis, or for someone else.

**CHAIR SPEIER:** I understand.

**MR. BAUM:** And the other piece of it is, is the cross fertilization right now. It's critically important that each of the key people know what's going on in the other division.

**CHAIR SPEIER:** Okay. Two bills that I carried this year, that the governor signed, will require the department now to have the same opportunities for the providers of healthcare to complain, as they do in the Department of Managed Healthcare, and the ability to require prompt payment to providers in the

Department of Insurance's jurisdiction, much like the authority that exists in the Department of Managed Healthcare.

And Commissioner, I'm sure you agree, that as healthcare is evolving, and as much of healthcare is moving from managed, in some respects, to PPOs, that the standards that have been created in the Department of Managed Healthcare are ones that we should make sure are operational in the Department of Insurance, as well. So my question to you is, have you anticipated those two new laws, and in terms of the administration of the department and the technological underpinnings, are you prepared to have that be implemented?

**COMMISSIONER GARAMENDI:** I may need Tony's help again. I think we may need a lot of help on this. Your legislation creates a very significant increase in the workload of the department. As worthwhile as it is, it will be a major challenge, because the potential for literally tens of thousands of complaints to be received by the department exists, and we are working our way through it. There are significant budget and personnel issues that need to be addressed to meet the requirements of your legislation.

I'll ask my staff to go through it.

**CHAIR SPEIER:** Well, Commissioner, I don't want to really focus on these bills, necessarily, except that they're now law. We have a disagreement as to the actual impact it would have on the department. And if I'm wrong and you're right, I'll be the first to say, let's add staff. But we compared the number of complaints filed in the Department of Managed Healthcare, it's much bigger in terms of the number of entities and the number of insureds, and then extrapolate it from that. So if, in fact, over time it appears that their numbers were not a basis on measurement, we will certainly address that.

But, just a simple question, are we preparing to implement?

**MR. CIGNARLE:** Yes, we are. We've filed a BCP with the Department of Finance, so that was recently approved. The bill requires as of July 1, 2006, we expect to have the staff on board at that point, as well as all the technical aspects in place regarding the provider complaint form, the new provider health informational page, as well as some announcements going out to the provider industry.

**SENATOR SPEIER:** And the BCP was for how many positions?

**MR. CIGNARLE:** It was for ten total positions—two positions in our legal

division, to take any enforcement action with regard to any of the investigations that do occur; one position in market conduct, to perform strictly health related examinations; one position on our call center, to take in the additional calls that we expect from providers, and six positions in our claims services bureau, which will be the actual hands on professionals that will be taking these complaints in, investigating them, and building the cases.

**CHAIR SPEIER:** Okay. And that is what you requested and you got what you requested?

**MR. CIGNARLE:** That's correct.

**CHAIR SPEIER:** So you shouldn't have any issues then around workload, it sounds like? Okay.

All right. Mr. Kelso.

**CLARK KELSO:** Good morning, Madam Chair. My name is Clark Kelso. I'm here in my capacity as the state's chief information officer. I'll keep my remarks very brief. What I'd like to do is distribute to committee members.

And basically what I'd like to indicate is that the Department of Insurance does appear to be very well aligned with the strategic direction that we have set for the state's IT program, in general.

As you heard, looking at your general report on the department and the summary of department operations, as this committee knows, the Department of Insurance is a little bit of a microcosm of all of government. It's got enforcement, licensing, a very large call center, regulatory powers—it does a little bit of everything that government agencies do.

As you've heard this morning, they are embarked upon a substantial effort to move their business systems and their IT systems towards web enabled, and increasingly electronic or self-service, while maintaining an existing multi-door access to the Department of Insurance. So, they're not turning their back on other methods of access.

On pages 8 and 9 of the strategic plan, you can see access is the first goal that we have set for the state's IT program and for its business programs. And the Department of Insurance, as you've heard, is engaging in, and has engaged over the last several years, in a series of projects under actions two on page 8, to improve the delivery of services to citizens, to businesses, to intergovernmental programs,

interstate cooperation. They really are doing a very good job of updating their technologies in a way that improves services, and that's important.

On the cost efficiencies and consolidation, if you'll turn briefly to page 23 of the plan, on action item number three, we talk about how do we update and make cost-effective our legacy applications and systems. It seems to me the Department of Insurance is doing that quite well by making, as much as they can, their business operations web enabled. That is likely to be a good strategy for avoiding the problem of having twenty-five 30-year-old legacy systems that in 20 years we'll have to replace. The web enabled systems tend to be much more flexible in being adaptable to changes.

And over on page 24, action item six, the department is embarked on a substantial voiceover IP implementation that quite a few other departments are following closely. We've established a workgroup that is interdepartmental that is monitoring their progress so that we can learn as much as we can about how you would take advantage of a department wide voiceover IP implementation that is truly statewide. As you know, the Department of Insurance has some 16 or 18 separate facilities; very large presence in Los Angeles and San Francisco, as well as Sacramento. We're very interested in their progress and the lessons that will be learned from that voiceover IP.

I'd love to say that my brief time as acting insurance commissioner and my current position, I'd love to say I could take credit for all of the good things that are happening there, but I was insurance commissioner too long ago to take credit for it. And as state CIO, I can encourage, but the responsibility here lies really with the department, with the current insurance commissioner, their executive team and their IT staff. As best we can tell, they are moving in exactly the right direction that we would like all departments to move.

I thank you for giving me an opportunity of appearing today.

**CHAIR SPEIER:** Mr. Kelso, do you then look at every department to determine whether or not there are areas where they should be updating their systems then? So like the Department of Motor Vehicles, for instance?

**MR. KELSO:** Yes, we do. And many of those same departments have internal plans that either are fully developed, or are being developed, for how they can begin to move off of some of those legacy systems. And the problem, as I have said in

many contexts, it is not so much that these systems are not going to work, many of these systems work perfectly well. The hardware works; the computer program still works. The biggest problem we have, is many of the employees who actually built those systems and know how they operate, and know how to maintain them, those employees are themselves nearing, or are past, retirement age. And the problem that we see really around government, is we're losing the people who know how to maintain those systems. And in that sense, we really have, sort of, legacy employees who we're losing much more than legacy systems. But we have departments throughout government—EDD, DMV, just as two examples that I'm dealing with recently that are looking at how they can modernize their legacy systems.

**CHAIR SPEIER:** So this is certainly not the purview of our committee, but if you were to nudge a particular department to step up to the plate and do, in part, what the Department of Insurance is doing, and you were going to advise the Legislature on an area or department that we should be focused on, what department would it be?

**MR. KELSO:** Oh well, that's a very interesting question.

**CHAIR SPEIER:** Or which departments would they be?

**MR. KELSO:** Well, I don't know that I'm prepared to identify particular departments today for that. There are a number that are engaged actively in this process that I certainly can identify. EDD is actively examining how it can pull its systems together. DMV is looking at it. These tend to be, as you might imagine, for this bigger departments, rather expensive transitions. And certainly the advice that we're giving all of them is, don't come forward with this gigantic ticket that's a quarter of a billion dollars to upgrade. This is something that has to happen step by step in smaller pieces as much as anything, so that we keep the risks of all of these projects at an acceptable level.

DOJ is another example that comes to mind. They are in the midst of a substantial upgrading of their criminal information systems.

So, this is actually activity that's ongoing in quite a few departments. And the way that I do tend to nudge is through the strategic plan, where we highlight, for example, modernization of legacy systems. Although I don't have any budget authority, it is fair to say that something that appears in this strategic plan does

tend to drive departmental interests to some extent.

**CHAIR SPEIER:** Okay. Questions.

**SENATOR COX:** Thank you, Madam Chair. I'll just direct a general question. Mr. Commissioner, I certainly acknowledge that there has been some technological progress relative to licensing and all that sort of thing. I am interested in knowing whether or not the contracts that had been let for these various....were they sole source contracts or are those....

**COMMISSIONER GARAMENDI:** No, sir, they were not. The telecommunication replacement project and the enterprise information portal were both done through competitive bid, both which exceeded our delegated authority and required the DGS actually lead the procurement.

**SENATOR COX:** So they're not sole source, but through the Department of General Services?

**COMMISSIONER GARAMENDI:** Competitive bid, yes, sir.

**SENATOR COX:** Okay. Let me just ask you also, Mr. Ward, I'm not sure that this is exactly in your _____ but maybe the chief deputy, you did, in fact, on July 1, 2005, have a $28 million surplus and I'm wondering, you had that $28 million surplus but next year you're asking for an increase in assessment. I'm interested to know where that $28 million dollars went in broad general terms.

**MR. WARD:** May I ask the source of your reference?

**SENATOR COX:** Yes. It is from the California Department of Insurance industry meeting November 16, 2005, on page 3 where it says "November 15th actual fees and license cash balance, ending cash balance $28,500,000." I got my information from the Department of Insurance.

**MR. WARD:** Yes, sir. We had a meeting with the industry on November 14th, at which that was given as a handout. The last time we met with the industry to review the department's licensing fee cash balance was about a year ago. Prior to that in November of '04. At that time we told the industry that we thought that we would finish the '04/'05 fiscal year with approximately $18 million dollars cash balance fees and licenses. When we met with them last week, we updated those figures with actuals through June 30th. And in fact, we've actually increased our cash balance to $28 million. There were two sides to that. One is, we had reduced expenditures. We didn't spend what we projected we would spend. And on the

revenue side, we actually took in more revenue than anticipated, almost to the tune of $6 million dollars resulting from late fees that were imposed on workers' comp insurers in connection with their securities that they filed with us.

**SENATOR COX:** The question is, do you still have the $28 million dollars in the bank then?

**MR. WARD:** Yes, sir. And we've...

**SENATOR COX:** But at the same time the department is now asking for a substantial increase in assessment for next year?

**MR. WARD:** No, sir. No. What we projected to the industry is, is if we continue with revenue flat, and we don't have any basis at this point to believe that it will be anything other than flat, but we assumed a flat revenue strength. We also looked at our expenditures based on projected budget authority. And if you carry those forward, then we told the industry we felt that a fee increase would be necessary effective July of '07. And the only reason that we would need a fee increase in 2007, would be to maintain what we believe is a prudent reserve of our unrestricted funding source to cover cash flow needs in all aspects of the department's operations, particularly those restricted funding sources where revenue does not match expenditures on a month to month basis.

**SENATOR COX:** So the increase is not until the year 2007 based on the current projections?

**MR. WARD:** Yes, sir. On July of '07. I believe it was a seven percent fee increase is what we projected.

**SENATOR COX:** And at that particular time you would have in the department about $10 million dollars reserve?

**MR. WARD:** We'd finish that year after the fee increase of around $10-, yes sir.

**SENATOR COX:** Okay. Let me just ask a couple of other questions, and I'm not sure exactly where to put all of this in. In preparing for this committee hearing today, I went to the department's website and one of the interesting things, and I know we're going to talk about fraud and workers' compensation a little bit later on, but Mr. Ward, I believe the webmaster, that's your responsibility?

**MR. WARD:** No, not really. We have a...

**SENATOR COX:** Well, let me just give this to you from the standpoint...

**CHAIR SPEIER:** Is the webmaster here?

**MR. WARD:** The webmaster is not here.

**SENATOR COX:** Well I was interested only from the standpoint, I know how much the department has tried to work in terms of communication, and I want to, by the way, Mr. Commissioner, as you about the staffing on your press books. You had a staff of five, and now I think you have eight, and I need some sort of explanation relative to that; just interested in that. But I noticed that on the workers' compensation part, the last time that this particular document was updated was May 12, 2003, and it just seems to me that a department that's interested as you all are in communication, that for some reason you wouldn't be talking about fiscal year 2000/2001 in....you may want to take a look at it. I'm sure you don't have an explanation for it today, or maybe you do. But if you just take a look at it, I'd appreciate it.

Mr. Commissioner, could you address the issue relative to....and by the way, you'll find this in the Department of Insurance material from the Department of Finance. It talks about your staffing relative to the press portion of your operations. It does propose in 2005/2006, that you, in fact, have eight people; you, do in fact, have five. I'm interested in explanations relative to this particular issue.

**COMMISSIONER GARAMENDI:** Apparently from your comment a moment ago, you may need one more person to deal with the website.

**CROSSTALK**

**SENATOR COX:** Or use the ones that you have, sir.

**COMMISSIONER GARAMENDI:** We'll certainly ask the webmaster about this. But let me speak to the issue that you raised. One of the key ways to protect consumers is to provide them with information. We have made major efforts to provide a variety of information to consumers about the perils, the advantages, and the opportunities that exist within the field of insurance, and that involves everything from annuities and seniors, some of which legislation was passed by this committee. Also, it involves a significant increase in our effort to develop an internal mechanism for the sharing of information and knowledge within the department. I think that you're looking at perhaps three additional people over a course of three years to accomplish those tasks. And apparently we still haven't achieved the result that I would like, which would be an updated website.    **G&C 00671**

**SENATOR COX:** Well, Mr. Commissioner, I appreciate that. Let me just share with you the listings, and it talks about Informational Officer II, Informational Officer I, Associate Government Program Analyst, Staff Service Analyst, Executive Assistant, and you're saying those are folks that are necessary to get the information spread throughout the department?

**COMMISSIONER GARAMENDI:** No, I didn't say that at all. I said that that was an additional task that was added to this function.

**SENATOR COX:** Oh, I see. Okay. All right. Thank you.

**CHAIR SPEIER:** So, where does the web function come if it doesn't come under communications?

**COMMISSIONER GARAMENDI:** It does.

**CHAIR SPEIER:** So is the webmaster one of those positions?

**COMMISSIONER GARAMENDI:** Yes.

**CHAIR SPEIER:** So the webmaster is one of those positions, and hey, they haven't updated something since 2003, especially workers' comp of all things?

**COMMISSIONER GARAMENDI:** Apparently not.

**CHAIR SPEIER:** Someone is coming forward now to save the day.

**MR. WARD:** Madam Chair, Dan Whetstone is our CIO, and I think he can give you some information on some recent changes that we've made on the website.

**CHAIR SPEIER:** So, are you one of those individuals in that listing that...

**DAN WHETSTONE:** No, I'm not.

**CHAIR SPEIER:** Oh, so where is your function?

**MR. WHETSTONE:** I'm the CIO for the department—chief information officer.

**CHAIR SPEIER:** Which is different from communications?

**MR. WHETSTONE:** Yes, it is. I'm responsible for this entire IT organization.

**CHAIR SPEIER:** I see.

**SENATOR COX:** So you're not in this eight press folks?

**MR. WHETSTONE:** No, I am not.

**SENATOR COX:** Okay.

**MR. WHETSTONE:** As they said, the webmaster does report to the communications office. We're currently undergoing some huge changes on our website. We've purchased content management system for the website and things such as the document that you addressed. We will know about those in the future

because they will be aged and brought to people's attention.

But yes, right now there are some problems in our website.

**CHAIR SPEIER:** What other problems beside the ones Senator Cox just identified?

**MR. WHETSTONE:** Just mainly aging and that sort of thing.

**MR. KELSO:** And Senators, this is a more general problem than just with this department. Many of the state's web pages are what I refer to as static, in the sense that it just presents information. And the problem you have is, with the number of pages that we have that are static, they become stale. Unless you have some process of, essentially, routine review by program people who know whether there's been a change. So this is a serious problem, Senator Cox. I'm glad you've raised it in this context. It's something that I can remind other departments to take a look at as well.

**CHAIR SPEIER:** This says 2000/2001 data. So we're looking at data being reported about the Fraud Division in that year, district attorney reports of the number of arrests in that year. Separate from it just being stale information, I think it makes all of us in government look like we're not on top of things.

**COMMISSIONER GARAMENDI:** Madam Chair, if I might. There's substantial updated information on the website with regard to workers' comp and most every other thing. The issue of stale documents is one of the things that we're trying to deal with, but I suspect that if Senator Cox had gone to other portions of the website he would have found much more updated information than this. And I don't know where this one was on the website. We'll have to find out.

**SENATOR COX:** Mr. Commissioner, with all due respect, it's on the first page

**COMMISSIONER GARAMENDI:** Perhaps so.

**SENATOR COX:** Where it says "fraud", and I clicked on the fraud portion, and listed underneath the fraud, it has to do with...

**COMMISSIONER GARAMENDI:** Well, perhaps I should ask for more staff, or make the staff work a little more efficiently.

**CHAIR SPEIER:** Well, I would just have the webmaster do his or her job, it sounds like. I mean, what does the webmaster do if they do not update the web?

**MR. BAUM:** We certainly don't disagree. And in fact, that's, as Mr. Whetstone just said, we've gone through, literally, this last six months, a contracting process

that has allowed us to now have a much more interactive website so that each division and each sub-bureau is responsible for keeping the data updated. It was for this very reason, I mean....I went on it when we first got there and I found stuff from 2000 that was on there. And it was that that caused us to sit down with Dan and the communications folks and say, "We need to redo the mechanism that we're using for managing the website." So we have a very different one. We are in the process of going through every one of these things. It happens to have literally been happening over the last two or three months.

**SENATOR COX:** Well, Mr. Garamendi, let me just ask you a different question and that is, I pointed out to you where it says this has been revised on....one of them was July, and the other one was May, I believe, 2003. And sometimes when you deal with websites, even if you change a color, that then means that it has been revised. What I mentioned to you was the 2000/2001 numbers relative to the number of cases that were submitted and all that sort of thing. It begs the question; whether or not you have, in fact, the data for 2002, 2003 and 2004? That's the real issue. Is, have you correlated that data and if you had the....could, in fact, the webmaster put in the numbers to replace the existing numbers that are here in terms of cases that were submitted and what monetary amount and restitution and all that sort of thing?

**MR. WARD:** Well, the short answer is, that we not only have the data, I think we supplied much of the data to this committee in preparation for the hearing.

But, with respect to the question I think you're raising, which is, having timely documents on the web, that is the whole purpose of what we've just gone through so that that will, in fact, be the case. We do not disagree that the information that we have on the web should be as timely and accurate as possible. We've just set a system that will now allow us to do that.

**SENATOR COX:** So you have collated all the information to replace the numbers that are on this website?

**COMMISSIONER GARAMENDI:** In a few moments, when you get to the fraud portion of this hearing, you'll have the updated information. You already have it in your file.

**SENATOR COX:** Okay. We'll see. And if, for example, you don't have it in the binder, you don't have any difficulty in providing it to us?          **G&C 00674**

**COMMISSIOINER GARAMENDI:** Absolutely.

**SENATOR COX:** Okay. Thank you, Madam Chair.

**CHAIR SPEIER:** All right. Thank you.

**SENATOR COX:** One more question. I apologize. Any of the $28 million spent for technology?

**COMMISSIONER GARAMENDI:** I'm sorry, what was your question.

**SENATOR COX:** Any of the $28 million surplus spent for technology?

**MR. WARD:** Yes.

**SENATOR COX:** I didn't see in your budget where you had specifically allocated x-number of dollars for technological improvements.

**MR. WARD:** The department's every infrastructure, improvement, or procurement that we make is spread to all of the department's revenue sources based on our cost allocation methodology. So we know, based on how the employees record their times and activities, we know which revenue sources should pay its share of infrastructure procurements.

**SENATOR COX:** And then would you provide that information to us. I don't think we have it in this material.

**MR. WARD:** Absolutely. And I would like to mention that when we met with the insurance industry in November of 2004, we did that precisely. We broke out exactly what piece of these IT expenditures were going to hit fees and licenses so that they could see it. We were fortunate, in all honesty, that we had substantial increase in revenue from these workers' comp late filing fees that allowed us to engage in these infrastructure improvements much faster than we probably otherwise could have.

**CHAIR SPEIER:** You're welcome. That was my bill.

**COMMISSIONER GARAMENDI:** Thank you, Madam Chair.

**CHAIR SPEIER:** All right. Thank you. Now we'll move on to Consumer Services and Market Conduct Branch. We're going to take that next because we have a number of witnesses, evidently, who are here and want to testify on the auto body issues.

So, Mr. Cignarle, if you would come forward and then I'd like to ask Gene Crozat and Allen Wood, and, I believe, Mike Gunning from PIFF is here, and Kate Theil from ACIC. And then any other witnesses from the auto body shop community

who are here to testify, you're welcome to come sit in the front row and then come forward after the other individuals speak.

Okay, Mr. Wood, if you'd like to come forward, you can sit at this other seat up front here.

Now Commissioner, this issue came to the attention of the committee about a year-and-a-half ago. We've had a number of informal gatherings on the issue. And I think I'm frustrated in that it does not appear that we are making a lot of headway. So you're going to hear testimony from a number of people this morning, and then, hopefully, we can resolve this. I don't think this is a tough issue to resolve. I think there's a simple fix out there. I think if we put our heads together we can get it.

What is disturbing to me is that there are so many complaints that have been filed with the department, apparently without a response. I'm hoping this new technology system is going to allow you to kind of check on the age of complaints in a timely fashion so that you can, in fact be responsive. But why don't we get started.

Mr. Crozat, if you'd like to come forward. And then, Mr. Cignarle, if you can be prepared to respond after all of the people testify. Mr. Crozat, would you like to begin? Please begin. State your name please.

**GENE CROZAT:** My name is Gene Crozat. I represent G & C Auto Body. We have three stores—one in San Rafael, one in Petaluma, and one in Santa Rosa. I've been repairing cars since 1961, personally, and painting cars over 40 years. I took it up in the Air Force, and that's where I started my training—Castle Air Force Base. And like everybody, we all move along and roll like a tumbleweed and grow.

At this point in time, I've seen the industry make a lot of changes from when I started. We all know what we think the problems are here today, and I'm not here to tell the Commissioner what to do or how to do his job. I can tell from sitting back here, he's got a very big job and it's just not the window that I'm here to address.

But what I am here to address is customers, consumers being treated horribly. Women in wheelchairs crying in my office and my lobby that the insurance companies won't pay their bills. They don't know what to do. The adjuster tells them, "Why don't you pay it out of your pocket?" And, "Mr. Crozat, why don't you eat it?

Now I want to say, there's a lot of good insurance companies, and I know a lot

of them are here today. But I know there's also bad ones. And there's good body shops and there's poor body shops.

The bottom line I would like to say, first of all, our communication with the Department of Insurance really started back a year or so before this letter addressed to me is November 2, 1995. And this letter is from Cindy Osias.

**CHAIR SPEIER:** She's somewhat famous in the department.

**MR. CROZAT:** And I asked her, "What do we do? Insurance companies are coming in here and arbitrarily capping paint materials."

An industry standard started, I'd say in the early seventies. Before then, all body shops bought their paints from local paint stores. You went down and you got a factory pack. Nobody mixed their own. You bought a pack that was made up from the factory. And, you got receipts. Soon, the industry realized there was larger and larger shops and they started mixing their own. We didn't mix them in pints and quarts, we bought bulk and gallons. My store alone purchased probably over $100,000 a month in paint. We buy in bulk. There no receipts accept for bulk material. And paint material is paid in the industry by the hour, just like labor hour. For every hour you paint, you get x-number of dollars an hour for every hour you paint.

Well, it doesn't make sense to me, and it never did, and I don't think it does anybody in this room, that if paint material now is capped at $350 and you paint in, say, eight or ten hours, and that was at $350 cap, where did the money go to pay for the material for the other 15 or 20 hours? It's arbitrarily stole off your bill. And that insurance company, the ones that do do that, say, "Mr. Crozat, either eat it, or make your customer pay it."

And what's happened, when people bought their insurance, they were told to pay their deductible and the remainder of the bill would get paid.

I would like to say that in our endeavors to settle this problem, this letter was written to us from Cindy Osias, it says, "Dear Mr. Crozat: Upon my return from vacation, I reviewed the documents and complaints you sent in which you allege that certain insurers are refusing to pay more than a certain amount for labor costs for car repairs. I then contacted the Consumer Service Division of the department to learn what had occurred at the level of the complaints. Interesting, at the same time the Commissioner referred a letter to me which brought to his attention some

insurer's practice of arbitrary capping or limiting the cost of paint and material used in repairing insured's vehicles.

The department's position is this, the practice of arbitrary capping or limiting cost is illegal. I will outline the reasons below in depth."

A very deep letter on everything that tells you why you cannot cap paint materials. That was back in '95.

**CHAIR SPEIER:** All right. So, fast forward to the year 2005.

**MR. CROZAT:** Complaints to the Commissioner, G & C Auto Body has sent... where are those boxes. I'd just like, not to go through any, but just let everybody get a visual of how many there are. Because it would take you a week to go through them. These are Department of Insurance complaints.

**CHAIR SPEIER:** That you've filed? In any case, there are a lot of complaints there, is that correct?

**MR. CROZAT:** G & C and its consumers have filed over 800 complaints. To this date, I haven't heard whether the Department of Insurance has hollered one foul.

**SENATOR COX:** Mr. Crozat, you need to address the committee.

**MR. CROZAT:** I'm sorry. To this day, I don't know that anybody has called one foul on any one of these complaints—over 800 of them.

**CHAIR SPEIER:** All right. So, one of the first issues, you just mentioned capping, which there's a letter from the department back in 1995 by Cindy Osias that's saying arbitrary capping is illegal.

**MR. CROZAT:** Is illegal. In this letter she outlines below all the reasons she'd say it is illegal.

**CHAIR SPEIER:** All right. The other issue, Commissioner, that kind of struck me as being interesting, it is a clever way, to the extent that a company would cap the payment relative to painting and include the cost of paint in that cap, is that the state loses sales tax in big chunks. And in fact, I think I read somewhere in these documents, as much as $45 million a year. So, to the extent that we allow capping to go on, and whether it's arbitrary or reasonable, the fact that the sales tax is not being paid is a serious issue that you and I should both be concerned about. So I think that really needs to be addressed by the department. Do you have a comment on that?

G&C 00678

**COMMISSIONER GARAMENDI:** My staff is prepared to deal with this entire issue. The capping issue was not brought to our attention prior to this hearing, but we'll be happy to discuss that.

**CHAIR SPEIER:** The capping was in the backgrounder.

**COMMISSIONER GARAMENDI:** Tony.

**MR. CIGNARLE:** Madam Chair, the great majority, 99 percent or more, of the complaints filed with the department, relate not to capping paint materials. We've only received less than seven complaints in the department that relate specifically to the paint material cap. The majority of the complaints relate to the labor rate capping—setting a labor rate based on a labor rate survey, as well as alleged steering of the consumer to a DRP (direct repair program body shop).

**CHAIR SPEIER:** All right. But, you're now alerted to the fact this is an issue. It's a loss of revenue to the state. It's something that has to be addressed, right?

**MR. CIGNARLE:** In reference to the complaints over the last six months, we have seen an increase in the paint material complaints mostly from Mr. Crozat's operation. We are looking at those issues. We have inquiries into all the insurance companies that are involved. We'll be looking at that. We don't disagree with Cindy Osias' legal opinion. We agree with it. And if there is arbitrary capping of paint materials, we will act accordingly on that.

With regard to the sales tax issue, I understand that issue was presented to the attorney general's office, and we will defer to them as to where that investigation goes.

**CHAIR SPEIER:** Well, separate from deferring to where the AG goes with past practices, sales tax should be paid on products in California, period. And the extent to which it's not being paid, is inappropriate, and I would think the department would want to take steps irrespective of what the AG does.

**MR. CIGNARLE:** Absolutely, but it's a question of how much the body shop charges, not how much the insurance company pays, or is willing to pay for a claim. The body shops are the sole determining entity that determines how much they're going to charge and how much of that is tax. If the insurance company is only willing to pay a certain amount, and the body shop believes that it's due a higher amount, it will charge the consumer that higher amount, in which case the sales tax will be higher and thus paid to the state.        **G&C 00679**

**CHAIR SPEIER:** Senator Cox.

**SENATOR COX:** Well, it appears to me that material, Mr. Crozat, that you passed out, your issue has to do with capping at $350.

**MR. CROZAT:** That's just one issue.

**TODD BISHOP:** Actually, Senator Cox...

**CHAIR SPEIER:** Wait a second, sir. You haven't been recognized yet. We're having Mr. Crozat present, along with questions from the committee.

**SENATOR COX:** Well, okay. It seems to me....and I understand the issue of capping....your problem is that the insurance companies have capped the paint and materials at $350. That's just one issue. But in fact, the state of California does collect the full 7.5 percent or whatever the sales tax, 7.5, on the full $350 plus. It was a sublet of $4, so $350, they did, in fact, collect the entire 7.5...

**MR. CROZAT:** What about the other $8- or $900 they took of the bill arbitrarily? Reached across the table and ripped it off the page and say, "We're not paying the difference.?

**SENATOR COX:** I'm just trying to establish that sales tax was in fact paid on the $350.

**MR. CROZAT:** Sure. On the very lower amount. That wasn't the bill.

**SENATOR COX:** Okay. All right. And the bill that I see, I don't, in fact, see however, that you're bill has been reduced by a specific amount because it was not paid by the insurance company.

**MR. CROZAT:** No, present a bill and they arbitrarily tell the customer as another method to steer, "You either pay this out of your pocket, or you can go where we send you." That's another method to steer. They use many methods, and as we go to steering _____, I'll keep it to five minutes, I'll show you where I'm trying to take this.

**SENATOR COX:** California Casualty is a company in which you are contracted with or not?

**MR. CROZAT:** No.

**SENATOR COX:** You don't have a contract. Do you have contracts with other companies?

**MR. CROZAT:** I do.

**SENATOR COX:** Okay. All right.

G&C 00680

SENATE COMMITTEE ON BANKING, FINANCE & INSURANCE

**CHAIR SPEIER:** All right. Why don't you present your presentation on the issue. I mean, I think what we need to get to, Mr. Crozat, is it because of your grit, you have gone to small claims court and had small claims court judges...

**MR. CROZAT:** I'll keep it brief. G & C _____ to provide you, our customer, the finest quality repairs available while protecting your investment and returning your car/vehicle to pre-accident condition. Unfortunately, there are times when insurance company will hold payment for processes that are required to return your vehicle into pre-accident condition. If by chance your insurance company should refuse to pay for some of these repairs, we will call you and explain each process and the options that you have. You may choose to, (1) not have the processes or process done; pay the processes or process out of your pocket yourself; authorize the process and let us assist you in filing small claims court action in an attempt to help you collect the amount not paid by your insurance.

California Department of Insurance regulation 2695.7 states, *Where an insured denies or rejects the first party claim in the hole or in the part, it shall do so in writing and shall provide to the claimant a statement listing all basis for such rejection or denial and the factual and legal basis for each of these reasons given for such rejections or denial which is within the insurers knowledge.*

*When insured denies a first party claim in the hole or in the part it is based upon a specific policy provision, a condition, or exclusion. A written denial shall include references thereto and provide an explanation or the application of that provision, condition, or exclusion to the claimant.*

*Every person who denies or rejects a third party claim in the hole or in the part, or disputes liability of damage shall do so in writing.*

I have never had a customer of mine receive this from an insurance company. And the Commissioner does not uphold this regulation. I don't know what book he is going out of.

Every person that wants to know why he's not getting paid should be told this, and I give it to them.

Then, as that as started happening, we have gone to court 250 times. Out of 250 times, we've lost 16 out of 250 small claims cases.

An awful lot of judges said the bill is fair and reasonable. The method of repair is fair and reasonable. You cannot fix labor rates. Judge Serena Wong said one

day, "If the labor rate has to be an x-number of dollars, how can it ever go up? What day is God going to come down and sanction an increase? He's not. It's blatant price fixing."

**CHAIR SPEIER:** All right. Let me engage with the Commissioner for a moment if you don't mind. Mr. Commissioner, my concern is this, this reminds me so much of what we call balance billing in the healthcare arena, where some of the providers now want to balance bill the patient because the specialists or the IPA did not actually pay the amount for the service. And certainly in the healthcare arena, we don't allow for balance billing. You cannot go after the patient for a payment that's not made.

Now, I just want to go through a few of these cases that the gentleman has just provided to us and see if you feel, as I do, that there's an issue here. I don't think anyone should have to go to small claims court to get their car fixed. We make our premium payments. When something unfortunate happens and we get into a car accident, there should be an expectation that it is going to be paid—fair and reasonable, no doubt. But just so you can....I'm just going to run through a couple of these.

This is a third party claim, Anita Bennets. She calls here insurance company, which was Farmers, and they say to her that she can go wherever she wants to get her car repaired. Geico, representative calls the consumer and tells her that if she goes to G & C and not to Blake's that Geico will not pay for the repairs and that the consumer will have to pay for them.

That's one.

The next one is a third party. In this situation the consumer is sent to Blake's for an estimate and the consumer is not comfortable with this arrangement. Geico representative tells the consumer that they do not pay whatever a shop wants and pays only a contracted rate regardless of the shop rate. The consumer calls Geico representative and tells her that the vehicle is at G & C. Geico representative tells the consumer that they have to pick up his vehicle and take it to Blake's for an estimate. The consumer calls the Geico representative and tells them that the vehicle is not safe and is not drivable. Geico representative tells the consumer that they still have to bring the car to Blake's for an estimate.

Another case: Geico representative instructs the consumer to take his vehicle

**G&C 00682**

to Blake's Auto Body where Geico does their estimates. One representative finished estimate, he asked the consumer if he wanted a check written to Blake's. The consumer tells the representative that he can make the check payable to G & C Auto Body. The representative tells the consumer Geico has problems with G & C regarding customer complaints, paint matching, and that Geico does not work with G & C.

That's just Geico. I mean, there are other insurers in here that tell a similar story. But in many of these cases, there appears to be real steering going on. And we didn't run that bill through the Legislature with the intent to have steering to continue to go on.

So, what do you say to the Geico insurance agent or adjuster, who makes those kinds of statements? Is there some kind of disciplinary action that should be taken against that individual?

**COMMISSIONER GARAMENDI:** When we receive a complaint, we have a process that has been longstanding to investigate the complaint. If we find there is evidence that the complaint is valid and there is a breach of either the regulations or the law, then appropriate action has been taken. I'd like Tony to bring you up to date on where we are with these complaints and others of this kind. Tony.

**MR. CIGNARLE:** To date, we've received, over the last two years, about 600 complaints regarding labor rate surveys and the steering issue. Sixty percent have been filed by Mr. Crozat; another total of perhaps 80-90 percent has been filed by about six shops, out of the 4,000 that are licensed by the Bureau of Automotive Repair. We've investigated every single one of them. We've responded to every single one of them. The implication that there has been no response is not accurate. We communicate with Mr. Crozat on a weekly basis, if not a daily basis between him and his assistant, Elaine Saturday, between all telephone communication, all the letters that go back and forth between the department and Mr. Crozat. We're aware of his ,Geico....Mr. Crozat will file complaints on a two-month period, let's say, against a particular insurance company. For a couple of months it will be Farmers, and in a couple of months it will be the Auto Club, a couple of months it will be State Farm. As of about three or four months ago he began a complaint filing with the department regarding Geico. We're currently investigating all those complaints. He's received a letter from us regarding those complaints. We've contacted all of the

consumers that are identified in those complaints. We've contacted Geico in every single one of those complaints. If we are able to find evidence of steering, or labor rate survey issues, we will take action. We have take three enforcement actions, to date, over the last....it was probably in the last three or four months against three different insurance companies. Each of those actions, two of them were specifically....the primary allegations in those complaints and those accusations are the labor rate survey issue and the steering issues. One was against Progressive; one was against Infinity; and one was against Mercury. We have a number of other cases in the works that we're looking at. At any point in time a case rises to the level of finding violations and putting together a case for our legal division, it will be sent up there. And we have a number of cases that we're looking at now.

I think one of the major issues though is the body shop industry, specifically Mr. Crozat and others have a different interpretation of the law. Specifically, almost all of Mr. Crozat's complaints and the body shop's industry complaints, state as their primary allegation, the fact that the labor rate surveys are invalid or inaccurate because the surveys do not contain the posted labor rate of the body shops. We do not share that interpretation. And in fact, that is absolutely contrary to how we interpret the law.

**CHAIR SPEIER:** Wait, wait, wait. Let's stop there. So you're saying that a posted rate, I walk into a body shop and the posted rate is not the rate.

**MR. CIGNARLE:** Is not the rate that is required based on our interpretation of SB 1988, that enacted 758 of the Insurance Code regarding labor rate surveys. The primary reason for that is, during the course of the year 2000, when SB 1988 went through its amendment process, for example in the April 13th version of the SB 1988, it added the sentence that would have specifically required the posted labor rate to be used in the surveys. Obviously, the insurance industry opposed this amendment. In the June 15th amended version of the survey, that sentence was taken out, therefore, it was left silent.

We believe the legislative intent is that we cannot require the insurance companies to use the posted labor rate as their basis for their surveys. We believe that the prevailing rate, which we define as the rate actually charged by shops within a geographic area regardless of what they may post as their labor rate, is the

G&C 00684

rate that should be used in the insurer's surveys. And that is the primary basis for the great majority of the complaints filed by the body shops.

**CHAIR SPEIER:** Now the fact that 250 cases go to small claims court and 95 percent of them are upheld would suggest that judges, or an attorney serving as a judge, has reviewed the law and interpreted it in a manner, and it's consistent. It's case after case after case.

Now, Mr. Crozat is an unusual person who has the time and the energy and the craziness, excuse me for saying that, Mr. Crozat, but who would take that kind of energy and pursue it in court? Who has the time and the money to do that?

Now, you said most of your complaints have come from Mr. Crozat and 40 percent from a smaller group of others. You and I both know that there's a whole sea of auto body shop owners out there that are fearful of coming forward, because if they come forward, they will be blackballed, they will lose their business, and they can't afford it. So our job is to fix it so that no one has to be fearful about it and just do the right thing. No steering. It's real clear. It's real clear in the law.

**MR. CIGNARLE:** We acknowledge that.

**CHAIR SPEIER:** And this issue about the posted....just because it came out of the legislation doesn't mean....you know what the process is here. That's not necessarily legislative intent. That's about trying to get a bill through the process and getting it signed into law. It's then up to you and the department to interpret that law and do what is fair and reasonable. Then why do we have posted rates at all? If they're not going to be used by anyone, why even require posted rates?

**MR. CIGNARLE:** I agree. We have interpreted it as I have described. That it does not require....these surveys do not require the posted rate to be used as the basis. If however, in a geographic area the shops as a rule charge their posted rate to customers, then obviously the posted rate and the labor rate used in the surveys, the margin will be greatly narrowed. But if the shops are charging much less money than what their posted rate is, then the prevailing rate which is in the statute, the prevailing rate charged by shops, that is how we interpret the statute, and that is how we've developed regulations...

**CHAIR SPEIER:** One last question and then Senator Cox has one. The law says that the car is to be returned to you in the pre-accident condition and that you have the right to take your car wherever you want and that any fair and reasonable

charges will be paid. For all intents and purposes, that's what the law says. So, I take my car to G & C, my insurance company or the third party insurance company doesn't want to pay their rate, but it's a fair and reasonable rate. What should prevail? Shouldn't the fair and reasonable rate prevail regardless of whether the insurance company likes it or not? I mean, the differential between these two rates is $86, so it's $11 an hour differential. And if all these cases have gone to small claims court and a judge there has found that to be fair and reasonable, I mean, it's not just one case. We've got 250 cases here.

**MR. CIGNARLE:** We absolutely take into account the fact that a consumer or a body shop has gone to small claims court and been successful. However, while that may allow us to more intensely focus on an issue and ferret out whether in fact there was or was not violations, in itself it is not a violation by the mere fact that a body shop or a consumer was victorious in small claims court.

**CHAIR SPEIER:** Okay. But let's go back to the conduct of the adjuster/agent. Go ahead.

**MR. CIGNARLE:** I'm sorry.

**CHAIR SPEIER:** If we go back to the conduct of this agent, I'm sure you've seen these complaints from Mr. Crozat, correct?

**MR. CIGNARLE:** Yes, I have.

**CHAIR SPEIER:** So many of the same people are making the same statements over and over again to different consumers saying basically, "You can't go there. You've gotta go here." There's signed affidavits. At what point does the department say to this insurance agent, or this adjuster, that you're not following the law? Have you taken any action against any of these adjusters?

**MR. CIGNARLE:** With regards to the Geico case, no. We are in the process of investigating that issue. And if we are able to gather the evidence and show that there is a violation, we will prosecute them. And it would not necessarily be against the adjuster specifically, it would be against the insurance company that employs that adjuster, because I understand it's an employee of the insurance company.

**CHAIR SPEIER:** So, there's no standard that the adjuster has got to maintain separate from the insurance company. It's an action against the insurance company?

**MR. CIGNARLE:** He acts for the insurance company.

G&C 00686

**CHAIR SPEIER:** He's an agent of the insurance company, so you go after the insurance company.

Actually, Senator Cox had a question.

**SENATOR COX:** I wanted to just talk about this labor rate survey for just a moment. And I've got three of four questions, Madam Chair, relative to this.

Talk to us about the labor rate survey. That's done by the department; it's done by the company; it's done based upon a region; the region is amalgamated; how was done, just for our edification?

**MR. CIGNARLE:** The insurance code statute requires that if an insurance company conducts a labor rate survey to determine and set a prevailing labor rate in a geographic area, that it must submit that survey to the Department of Insurance. And the Department of Insurance gathers those surveys and then makes that information available to the public upon its request.

**SENATOR COX:** All right. So, now then the question becomes about fair and reasonable. What goes into the labor rate survey, is it the contractual rate that the insurance company has....Mr. Crozat indicated that he has some contracts with some insurance companies. Is it that rate which is considered? What is the rate that is used?

**MR. CIGNARLE:** The rate that we believe should be used is the prevailing rate that is charged by the shops within a given geographic area. Not necessarily the posted rate, and not, specifically, the contracted rate because we believe the contracted rate to also be an unfairly discounted rate. So it's somewhere in between, and it's basically what we consider it to be in terms of whether it's accurate or not is, is the rates being charged by shops within the geographic area determined by the insurance companies.

**SENATOR COX:** So then it would be my understanding, based upon what you have said, that if the contracted rate, the body shop, it would be in their best interest to continue to raise their posted rate? It would be in their best interest to raise that.

**MR. CIGNARLE:** In our opinion it would have no effect on a valid survey because we would suggest that the posted rate is not used, and also the contracted rate. So, whether they raise their posted rate, it would only be applicable if they actually charged that higher posted rate to customers.

G&C 00687

**SENATOR COX:** But then with respect to the prevailing rate, there is a situation of where that may very well be higher than the contracted rate?

**MR. CIGNARLE:** We would suggest that it should be. The contracted rate is a discounted rate that insurance companies contract with direct repair program shops for both their parts and labor.

**SENATOR COX:** Exactly. Kind of like a preferred provider organization.

**MR. CIGNARLE:** Correct. And therefore, our opinion is that those rates should not be included in these surveys performed.

**SENATOR COX:** Which rates should not be?

**MR. CIGNARLE:** The discounted contract rates should not be included in the surveys.

**SENATOR COX:** Well, and my question, and the question is why? I need to understand that.

**MR. CIGNARLE:** Why not?

**SENATOR COX:** Yes. The question is, why not?

**MR. CIGNARLE:** Because we believe that rate is a discounted rate and the consumer should not be harmed because all the policies essentially, as Senator Speier suggested, need to put you back in substantially the same condition of that vehicle. And the regulations require that the insurance company pay for the amount which will cause the vehicle to be repaired in a workman like manner. Now, that can vary.

If you go to a high end shop like, Mr. Crozat's, he's going to charge higher than perhaps the going rate or prevailing rate in that geographic area. Do consumers have a right to go to his shop? Absolutely. Does he have a right to charge that higher rate? Absolutely. The question that we look at is, whether the insurance company is required to pay that amount, or whether in making its offer to the consumer, in essence, and to the shop, it has made a reasonable offer and what support did it provide in making that reasonable offer?

**SENATOR COX:** Is the reasonable and fair offer then, is that rate the prevailing rate?

**MR. CIGNARLE:** If the insurer has conducted a survey and has determined and set a prevailing rate in that geographic area, then in most cases the insurer will use that survey to suggest that is why we're setting that labor rate at, for example,

$76 an hour. We believe that to be fair and reasonable, and that is the amount that we're going to pay, and any additional amount that Mr. Crozat or other shops may charge, the consumer could be out of pocket.

**SENATOR COX:** Well, let me tell where I'm going with this. Mr. Crozat presented a bill and said he wrote off $800 off of this bill. I don't see this anywhere on the document. But I'm just trying to figure, it would seem to me that Mr. Crozat always is going to have his bill higher and he's going to look at the prevailing rate and say, "That's less than I, in fact, am charging and therefore, I'm going to write off x-number of dollars for you." So, tell me how that fits into the picture.

**MR. CIGNARLE:** Well, I don't think it necessarily fits in because Mr. Crozat was charging higher than everybody else in the geographic area, or at least at the high end of that range prior to the survey law coming into effect. So he was always charging higher than the rest of the shops in that area.

**SENATOR COX:** All of the adjusters and/or insurance company direct writers who have direct claim service, are they all required to read from the script as to what the law is?

**MR. CIGNARLE:** Yes. At any point in time an insurance company makes a referral to a consumer, they're required to either send a verbatim by statute based on SB 551, notice to the consumer advising them that they have a right to have the vehicle repaired in the shop of their choice; that they have agreed to go with the shop recommended by the insurance company; and the requirement that I think causes some misunderstanding between the shops is that specifically it requires the insurance company to advise the consumer that they will warrant the repairs once they've agreed to the DRP shop. So, many of the complaints that do come in regarding the labor rate, using posted labor rates, the insurance company is saying they will guarantee the repairs in the DRP shop, but they won't guarantee it in the consumer's chosen shop. It will take us five to ten days to come out and do an inspection of the vehicle. If you go to a non DRP shop and....those are the three or four major areas that the body shops contend is, in fact, steering. All of those are required by either statute or regulation for the insurance company to do. So, if the Legislature wants to prohibit that, we don't necessarily oppose that, but in our interpretation of the statute and the associated regulations, many of the things that the body shops are contending are illegal and, in fact, are steering, based on the