evidence that we do get from the shops and the documentation that we analyze, many of those things that do occur are, in fact, either permitted by law or required by law.

**SENATOR COX:** Does the department from time to time verify that it's the script that's being used?

**MR. CIGNARLE:** Correct. Both when we receive an individual consumer complaint, we look at that, as well as in our market conduct examinations of the insurance company.

**SENATOR COX:** Okay.

**CHAIR SPEIER:** And you do that because all of those are taped conversations with the adjusters, are they?

**MR. CIGNARLE:** No.

**CHAIR SPEIER:** Well, have you ever listened to....any complaint that's come to you, have you then gone to the insurance company and said, "We want the tape of that individual and that conversation?" Have you done that?

**MR. CIGNARLE:** We've analyzed that request. I'm not able to comment as to whether we've done or not done that. Our legal counsel has looked at that along with our investigators, and I'm not able to comment on whether....if we have, in fact, done that, it would be an investigatory issue that I'm not able to comment on.

**CHAIR SPEIER:** Well, I guess my only point is this, my understanding is, they're all taped conversations. So, it is the clearest, quickest way to find out whether or not there's steerage by just subpoenaing the actual tapes and then reviewing those tapes. And the fact that that hasn't happened, is probably not a good reflection.

And I guess....you know what I worry about, Mr. Commissioner, I worry about a lot of class action suits being filed. That's where this is going. And I don't think the insurance companies want to see that. And I don't think that we want to see that. We just want to see people get their cars repaired and that they get payment.

**COMMISSIONER GARAMENDI:** Madam Chair, this conversation has gone on for some time and it seems to me as though there is a fundamental question of what the law is, and how it is to be put into effect. If you would like to clarify the law with a piece of legislation, we'd be happy to work with you on such clarification.

**CHAIR SPEIER:** I don't think it needs to be clarified.    G&C 00690

**COMMISSIONER GARAMENDI:** But obviously from this conversation, there is a difference of opinion as to exactly what the law requires.

**CHAIR SPEIER:** Well, I guess I disagree with you. I think it's real clear. Geico, for instance, has not done a labor survey, so how can you possibly cap a rate if you haven't even had a labor survey. That's real clear in the law. You don't do a labor survey...

**COMMISSIONER GARAMENDI:** No, that's not where the lack of clarity is that I'm referring to. That, of course, is....

**CHAIR SPEIER:** Well, I'm talking about these Geico cases that I just referenced. Those are the ones that I was talking about.

**COMMISSIONER GARAMENDI:** And you just heard from my staff that all of these complaints, all of them, are either under investigation, or have been investigated. And the issue in the older cases have been resolved. With regard to those cases that are under investigation, they're under investigation. Everyone of them. Every one of these cases.

**CHAIR SPEIER:** But my understanding is, that in all of these cases, the only way the consumers were made whole was by going to small claims court, not by the Department of Insurance intervening.

**COMMISSIONER GARAMENDI:** This takes us to the ambiguity I was speaking to. The question that the small claims court dealt with the labor rate, and apparently the small claims court was not satisfied with the labor rate and required an additional payment to be made. That's fine. Now, if this goes to a superior court and we get a superior court decision, then we have to obey that. But we have regulations. We have a longstanding interpretations on this. If you find, or anybody finds those interpretations, or those regulations, to be inappropriate, then please change the law.

**CHAIR SPEIER:** All right. Mr. Cignarle, how much did Progressive pay?

**MR. CIGNARLE:** All three of those cases are currently scheduled for administrative hearing and they have not been settled or adjudicated at this point.

**CHAIR SPEIER:** So they actually haven't made any kind of....you've done market conduct...

**MR. CIGNARLE:** No. The pleadings have been filed and served against those three insurance companies. Once they're filed, a hearing is scheduled. The filings

only occurred maybe 90 days ago, ballpark, and so the hearings are scheduled and there are settlement conferences, etc. going on.

**CHAIR SPEIER:** Okay. All right. Mr. Crozat, if you would close. And then there are some other people that want say...

**MR. CROZAT:** I have a few recommendations.

**CHAIR SPEIER:** All right.

**MR. CROZAT:** One, the Commissioner wanted to know what he could do about adjusters that walked in arbitrary...Penal Code 550(b), *It is unlawful to do, or to knowingly assist or conspire with any person to do any of the following: To present, or cause to be presented, any written or oral statement as part of, or in support of, or in opposition, to a claim for payment or other benefits pursuant to an insurance policy knowing that the statement contains any false or misleading information concerning any material fact. Every person who violates paragraph 1, 2, 3, 4, or 5 of this subdivision is guilty of a felony and punishable by imprisonment in state prison for 2, 3, or 5 years and a fine not exceeding $50,000.*

If you, Mr. Garamendi, want to stop adjusters walking in and taking money off the table and making our consumers in California pay it out of their pocket, implement this. This is the law. It's never been implemented.

So, what I recommend is, you change the ruling. The Department of Insurance is not going to fairly handle people taking surveys. I suggest through the Bureau of Automobile Repair, that every year when you submit your license, that you submit your posted labor rate—what you charge off the street.

Why should Geico get any better deal than you, Senator, when you're coming to get something done? Why are they a sacred cow that they get a better deal than you? Lowered rates are deals you make for....concessions you make for volume work sent to you for a discount, and that helps them save money. But when you don't have a deal with them, you don't owe them a deal. They shouldn't get any better deal than you. That's what they don't seem to understand.

**CHAIR SPEIER:** All right.

**SENATOR COX:** Just a question.

**CHAIR SPEIER:** Go ahead.

**SENATOR COX:** Mr. Crozat, let me just ask you a question. You've got three shops. You're doing pretty well for yourself, I understand.

G&C 00692

**MR. CROZAT:** I don't know. I go home at midnight. That isn't pretty well.

**SENATOR COX:** I understand.

**MR. CROZAT:** But I go home at midnight and so does my wife. I see her once a week on Saturday.

**SENATOR COX:** I do the same thing. I didn't mean to get you into that particular situation.

~~**MR. CROZAT:** Okay. I just want to clarify.~~

**CHAIR SPEIER:** Maybe it's be design, is that what you're suggesting?

**SENATOR COX:** How many repairs do you do a month?

**MR. CROZAT:** Probably 600 repairs a month.

**SENATOR COX:** How many insurance companies do you have a preferred contract with?

**MR. CROZAT:** Probably a dozen.

**SENATOR COX:** How many major companies are in the marketplace in your judgment?

**MR. CROZAT:** Oh, I'd say 100, really. Maybe 50, really, in the marketplace.

**SENATOR COX:** And you do business with 12.

**MR. CROZAT:** I have discounted rates with 12.

**SENATOR COX:** You have a contract with 12.

**MR. CROZAT:** Right.

**SENATOR COX:** Is that 12, is that something that goes up and down?

**MR. CROZAT:** Sure, year to year. Their philosophy change; yours. You end some agreements, you take some on.

**SENATOR COX:** And so it's a situation of where that number fluctuates from time to time.

**MR. CROZAT:** Certainly.

**SENATOR COX:** Based upon what they pay. They decide that you're charging too much, or you want to much, or...

**MR. CROZAT:** Well, I've had some companies that stuck me at the same rate for six straight years. I finally had to say, "Look, my guys have families and wives that need insurance. I can't work for this anymore." They say, "Well, that's all we're going pay you."

Arrangements are dissolved because one side or the other doesn't like the

agreement anymore.

**SENATOR COX:** I understand. And when a person comes into your shop, I just need to know for...

**MR. CROZAT:** Certainly. Anything you want to ask me.

**SENATOR COX:** When they come into your shop, do you say, "By the way, I do not have an agreement with XYZ Company, which is one of the 12, and my rate may or may not be higher than the insurance company," is there a notification on your part?

**MR. CROZAT:** I have it posted right in my shop. I ask them what the insurance company it is for, just for information. If it's one of my direct repair companies, I have certain people that write those sheets for those companies, therefore, I'll get someone out there to help them.

**SENATOR COX:** And just tell me whether or not you tell the customer that your bill may be higher than the insurance company pays you in the event that they're not one of the 12.

**MR. CROZAT:** Yes, I do. Right here.

**SENATOR COX:** That written statement, you give it to them.

**MR. CROZAT:** I give it to them and then I have them sign it.

**SENATOR COX:** And you have them sign it.

**MR. CROZAT:** I make up an estimate, I say this is what it's going to take to fix your car. Now, if the insurance company should take part of it, they don't want to pay....I've had insurance come on and say, "Mr. Crozat, you lassoed them." And Allen Woods, who is here, which I have hired, who used to be at the Bureau of Automobile Repair, and Moses Gomez, who is sitting in here, used to be the Bureau chief for fraud, who also works for me now, are working on these problems. And what I'm trying to say is, we as a garage, do everything we can to inform everybody, this is what will happen; and if it does; sign it; we'll call you and let you know what you're options are. That's why we've gone to court so much.

As afraid as people are of going to court, they're so angry. We had one woman who has flown out from the Midwest twice who moved. She's been to court five times with State Farm, and they keep taking her back to court for $300. Five times, and twice she's flown out from the Midwest, which we paid her flight.

**SENATOR COX:** You paid her flight to come out. So with respect to the small

G&C 00694

claims, I want to understand, tell me what role you play with respect to the small claims. Do you pay their filing fee?

**MR. CROZAT:** We explain to the customer what her...

**SENATOR COX:** Just explain it to me.

**MR. CROZAT:** I'm trying to. We explained to her what she can do. It's right here. It's very clear.

**SENATOR COX:** If you do small claims, do you, in fact, pay the filing fees?

**MR. CROZAT:** I don't know, as we sit here today. I didn't get some questions to answer that. I don't know if we do or not.

**SENATOR COX:** Okay.

**MR. CROZAT:** We assist them. We tell them, "Look, you go in and tell them you've had...

**SENATOR COX:** Do you send them with representation? He's trying to coach you, by the way...

**MR. CROZAT:** I don't need coaching at all. Go ahead.

**SENATOR COX:** So do you send someone with them?

**MR. CROZAT:** Of course we do. They're afraid. They're petrified. Have you ever gone up in church and given a speech? You can't even open your mouth up. They're petrified. I've got women 70-years-old in a wheelchair shaking in front of court, but they're so mad, they're willing to roll into court and say, "Why am I paying this out of my pocket?"

**SENATOR COX:** I'm not suggesting you're right or wrong. All I'm trying to do is gather information.

**MR. CROZAT:** The information, as we've said, if you want to pay the bill to us...

**SENATOR COX:** So you, in fact, send someone with them?

**MR. CROZAT:** Yes, we do. Of course we do.

**SENATOR COX:** Okay. All right. And then, does the insurance company show up for the small claims action?

**MR. CROZAT:** They do when they appeal it. When they lose. Sometimes a few of them, which I think mistakenly, appeal it, because it's showing, like this here, they're telling people they're going to have to pay a certain amount and it's $550, I read to you, when they do get sued for a pattern of action of telling their people

G&C 00695

they're going to have to pay this, when, in fact, they don't. That's fraud. That's why we do it.

**SENATOR COX:** All right. Okay. Thank you, Madam Chair.

**CHAIR SPEIER:** All right. The next witness.

**TODD BISHOP:** Hi. Good morning, Senator Speier and Senator Cox. My name is Todd Bishop. I own Dibble's Collision Works in Sonoma County. I'm also the president of the Redwood Empire Chapter of the Auto Body Association.

I'd also like to start by saying that there are an awful lot of good shops out there, or a lot of....excuse me. A little bit nervous today.

**CHAIR SPEIER:** That's okay.

**MR. BISHOP:** I'd just like to start by saying there are some bad shops out there that do give us the appearance of an industry that has a bad reputation, but there's also some very good insurance companies out there, as well.

What I'd like to do first, there's so many things to cover. Mr. Cignarle stated that the...

**CHAIR SPEIER:** Let me interrupt you for a moment. Let's not rehash old grounds. So, let's have you speak to issues that haven't been addressed.

**MR. BISHOP:** Okay. All right. I have something to pass out. On page 2, this handout here, this was given to you last year at one of the meetings that we had with the insurance companies. And you actually read this out to the group of people that were here that day. The very top of this is the Department of Insurance reply on this. And at the very bottom, it says, *In this complaint it has also been alleged that the insurer improperly influenced the claimant's decision with regards to the selection of a repair facility. A finding on this issue is contingent upon a resolution of a question of fact. In this case, there is a dispute as to whether the claimant had already chosen a repair facility prior to the recommendation.*

Now, her statement was sent along with this complaint. And if you read her statement, the statement clearly says that she wanted to bring her car to Dibble's Auto Body before anybody mentioned something at the insurance company.

**CHAIR SPEIER:** So you're saying that the Insurance Department didn't read her statement well enough?

**MR. BISHOP:** They didn't read her statement, let alone, I included her phone number with it; I called her after I received this. Nobody from the Department of

G&C 00696

Insurance ever even contacted her to find out what really happened. Because the only two people that know what happened on the telephone is the two parties that were on either end of the phone.

**CHAIR SPEIER:** So, let's ask Mr. Cignarle. So an investigation was conducted. Who did you talk to?

**MR. CIGNARLE:** I'm sorry, the question?

**CHAIR SPEIER:** It states that you conducted an investigation. If you didn't talk to the claimant, who did you talk to?

**MR. CIGNARLE:** Our policy is, in every complaint received, whether it comes from the consumer or the body shop, most of these company body shops, we will send a letter to....if the body shop files the complaint, we'll send in a letter to the body shop, as well as the consumer, in every single case, advising that the body shop has made an allegation that these are the allegations that were made, and if they would please present us with their side of the story and/or any other documentation they feel is important for us to review in making our determination on the case. The great majority obviously do not contact us, of consumers that is. They do not respond to us. The mere fact that an affidavit or a statement by the customer is in the request for assistance sent to us by the body shop, is not enough for us to act on that complaint in terms of making a final decision of whether a violation has occurred. We must contact that consumer.

**CHAIR SPEIER:** Well, I understand that. But basically, all this letter, from the department says, is that they have a labor survey, therefore they can charge the rate they've charged. You haven't addressed the issue of steerage here, so you haven't never really talked to the consumer about whether or not they were redirected, and that's...

**MR. CIGNARLE:** Correct. We ask them, "Have you been redirected? Was it unfair?" That is in our letter to these consumers.

**CHAIR SPEIER:** All right. But you evidently never even talked to this person.

**MR. CIGNARLE:** We send them a letter.

**CHAIR SPEIER:** You send them a letter. So if they don't respond to the letter, then...

**MR. CIGNARLE:** Then it is ultimately a lack of information.

**CHAIR SPEIER:** So it's kind of a paper investigation that goes on. It's

actually...

**MR. CIGNARLE:** A case moves as fast and as far as the evidence leads us. And in many of the cases presented by the body shops, the allegations that they make, even if true, in our opinion, do not amount to illegal steering or a violation of the labor rate statute. As I suggested before, the posted labor rate is the great majority of the complaints. The fact that insurance companies state that they'll warrant the repairs if you do it in one of our shops, we won't do it if you go to another shop, that is required by the statute. As well, we won't do an inspection if you go to one our shops; we don't need to. But if you do go to one of our shops, we need to do an inspection and it might take three to five, or ten days to do an inspection.

**CHAIR SPEIER:** Are we better off to just have the consumer go out and get three estimates; go back to that system? Is that where we should go on this?

**MR. CIGNARLE:** We don't oppose that.

**COMMISSIONER GARAMENDI:** We don't make the law, Senator.

**CHAIR SPEIER:** Well, wait a minute. Mr. Commissioner, you make law all the time—let's be real clear about that. You make law all the time.

**COMMISSIONER GARAMENDI:** We write regulations based....no, we write regulations. There's quite a difference. We are left to interpret.

**SENATOR COX:** Let's take a vote. I vote you do. Two to one, sir.

**CHAIR SPEIER:** And the other part of this, if...

**COMMISSIONER GARAMENDI:** If you believe the law should be changed, we'd be happy to work with you.

**CHAIR SPEIER:** Well, Mr. Commissioner, what do you believe? I mean, you've got all of these complaints here. There, in my view, appears to be a pattern of practice. I mean, you come before the Legislature all the time and propose bills. If you think this should be changed, you can also propose it. I'm just trying to make people whole here. And if we're better served by having them go out and get three estimates, you know, let's do it that way. But to be able to tell them on the one hand that they go where they want to go, and then when they go where they want to go, they're told, "Oops, you know, we're not going to pay what the charges are." I mean, I think that's a total affront to the consumer. They have this insurance policy; they expect that they...

**G&C 00698**

**COMMISSIONER GARAMENDI:** Introduce a bill and we'd be happy to work with you.

**CHAIR SPEIER:** It's not about introducing a bill.

**COMMISSIONER GARAMENDI:** What is it?

**CHAIR SPEIER:** I think it's your job here, we're talking about.

**COMMISSIONER GARAMENDI:** We have investigated every one of these complaints.

**CHAIR SPEIER:** And you think that all of these complaints are without merit.

**COMMISSIONER GARAMENDI:** I know that almost every one of these complaints came from four body shops.

**CHAIR SPEIER:** I know, but what difference does it make if it came from four....these are four body shops that have the guts to speak up where others don't because they're afraid they're going to lose business.

**COMMISSIONER GARAMENDI:** That's also not the case. However, these complaints have come from four body shops. We've investigated all of these complaints. We're taking action on three insurance companies, which you've already heard about. We're enforcing the law as it is written and as the regulations have interpreted the law. Now if you believe, or this committee believes, that the law should be changed, we'd be delighted to work with you.

**CHAIR SPEIER:** Do you believe the law should be changed, Mr. Commissioner?

**COMMISSIONER GARAMENDI:** I'm not prepared at this time to answer that question. If you'd like us to give you a written analysis of where we are, we would be happy to do so.

**CHAIR SPEIER:** All right. Why don't you do that for us.

**COMMISSIONER GARAMENDI:** We will do so.

**CHAIR SPEIER:** All right. Would you like to complete your comments, please?

**MR. BISHOP:** Yeah. Just on this one little incidence I'd like to add that after receiving the response letter from the Department of Insurance, I was so upset, not only did I call the customer to see if she was ever contacted, but I contacted the Department of Insurance and I was advised by a Mr. Patrick Campbell that a decision that had been handed down from Mr. Cignarle that the department's

decision is, when they have a complaint they request the file from the insurance company. And as long as the insurance company's file does not have any documentation that would show any steering, then the department's decision is that no steering ever existed, period.

**CHAIR SPEIER:** That's a conversation.

**MR. BISHOP:** That's a conversation.

**CHAIR SPEIER:** All right. That's not something that was written on Department of Insurance stationary?

**MR. BISHOP:** That's correct.

**CHAIR SPEIER:** Okay. Anything further?

**MR. BISHOP:** Yes, I do.

**CHAIR SPEIER:** All right. Very quickly because we need to move on.

**MR. BISHOP:** I'll be real quick. I'd like to add that this actually came from me on the $350 cap, and this was just....I went into business in June 1995. This, ten years ago, my paint materials were capped at $350. It's still happening today.

Paint materials, the liquids, is a petroleum based product, okay. We just received notification that after Hurricane Katrina, our prices were going up 25 percent. Our prices on a yearly basis since 1995, have went up 10 and 15 percent, but we're still having a $350 cap on materials.

I have another little handout, and this is the last subject, pretty much. And this has to do with the labor rate surveys.

And Allstate Insurance Company: Now they were in trouble with the Department of Insurance in 2004. And apparently they had some issues with using their DRN labor rates to set the labor rates of shops. Now, on pages 3 and 4 of this, you're going to see Allstate's actual labor rate survey, which Allstate contends they did it with the help of the Department of Insurance. You're going to notice that there's 13 shops listed, okay. And by the way, there are a couple of these shops that are on here that Allstate does have direct repair programs.

On the next page, you're going to see the documentation of Allstate's market survey. And at the bottom it says, *It has been determined that the data gathered, the prevailing per hour labor rate for the above market area is $74 body, and it goes on.*

**CHAIR SPEIER:** Well, $74 wasn't even listed on any of this.

**MR. BISHOP:** You've got it. I wrote the phone numbers down. I called every

single shop.  Not one shop had a $74 an hour labor rate, okay.

**CHAIR SPEIER:**  So, we're they giving you the posted rate?

**MR. BISHOP:**  Yes, they were giving me the posted rate when I called.  And furthermore, if you add up all the 13 shops posted rate, okay, and then you divide it by 13, you come out with $82.67, I believe it is.  So, this thing is so far off base, it's ridiculous.

This particular company, we went to small claims court just a month ago.  The consumer had taken Allstate to small claims.  There's about $1,700 left on the table after materials, charges, in-labor rate differences.  And the very last thing, the consumer had requested that a judge hear the case instead of a pro Tem.  And Judge Cox, Conrad Cox, Sonoma County Superior Court, page 2 of his statement says, *The court finds that the rates...*

**CHAIR SPEIER:**  I'm sorry.  I'm not following you.

**MR. BISHOP:**  Page 3 of the handout.

**CHAIR SPEIER:**  Okay.

**MR. BISHOP:**  Okay.  States, *The court finds that the rates charged by Dibble's were reasonable and proper in that the repairs that were made were necessary and proper,* okay.  *The judgment is entered in the favor of Matt Gruget and against Allstate Insurance in the sum of $1,996,* okay.  It also says above that, *Allstate made no showing that the hourly rate used by Dibble's was excessive or out of the ordinary.*

**CHAIR SPEIER:**  And this is a superior court....was a small claims judgment, however, wasn't it?

**MR. BISHOP:**  Um hm.

**SENATOR COX:**  It was superior court.

**MR. BISHOP:**  Yes, superior court.

**CHAIR SPEIER:**  All right.  Thank you.

**MR. BISHOP:**  Okay.  And then to show that steering is actually going on, I....this, was just last week out of my store, as well.  It's not stopping.  Geico Insurance, they....a lot of these companies are, right now, out of control.  There's laws.  They're not being followed.

Something I remember, back to the Allstate Insurance, the survey that was done by Allstate was given to the Department of Insurance over three months ago to their criminal investigator.  And still, nothing has been done.

**CHAIR SPEIER:** All right.

**SENATOR COX:** How many matters do you conduct on a monthly basis? How many repairs on a monthly basis?

**MR. BISHOP:** Today, currently, about 62 years ago when the steering became very intense, I was doing about 100 jobs a month, so it's cost me right today about 40 jobs a month.

**SENATOR COX:** And how many preferred providers do you have?

**CHAIR SPEIER:** Direct repair programs.

**MR. BISHOP:** Today we are representing four.

**SENATOR COX:** Four. Okay. Thank you.

**CHAIR SPEIER:** All right. Thank you. Anyone else here from auto body repair owners that want speak? All right. If you would all come forward, we're going to give you five minutes each. All right.

Go ahead, sir.

**JOHNNY WALKER:** My name is Johnny Walker, owner of PJ's Auto Body Shop and Johnny Walker Performance Center of Sacramento.

Obviously, there's a difference between the bill, the law, as far as the labor rate survey, the Department of Insurance, the way they understand it, the consumer, the customer, and the body shops. And all the surveys that are done....I think I'm only in two of them out of ten of them that's done....and all of the surveys have the direct repair shops on there when you look at them. And Tony Cignarle said that they don't do that direct repair shops on the survey. They don't think it's fair to be able to put them on there and then to turnaround and to set a price for what the prevailing rate is. Well, the direct repair shops are on those surveys. And also on the surveys, there's shops on there. Shop A, B, and C, all the way around me that does not have any equipment, that has $3,000 in equipment, and I have $1 million. I've been in business for 30 years. And there's several shops around me that have no equipment at all, and they're on their survey. And so is that accurate and fair and everything else? I personally don't think so, myself. But at this point, I don't really care about the labor rate survey, and what they're going to do, and how much to charge and everything else.

On all my complaints that I send in, every response that I get back, it responds back that we find no wrong doing in the insurance company. They've done an

**G&C 00702**

accurate labor rate survey. Well, I sent in a survey that says the adjuster asked me to commit fraud in front of the consumer. Nothing about the labor rate survey. The response back is, they did a labor rate survey. I just got one back last week from Farmers. Fourteen months ago, I sent it in. And I got a response last week, it says Farmers done an accurate labor rate survey. And my complaint was, the Farmers adjuster asked me to....was going to give me one hours instead of three hour dent; it was going to limit my crows and protection; no color sand and rub; no tint and match; limits all the repairs...

**CHAIR SPEIER:** I don't know what all that means, but...

**MR. WALKER:** What they do is, they limit their repairs.

**CHAIR SPEIER:** So no tint and match, it means you just put a stock color on the car?

**MR. WALKER:** Yeah. You take whatever you get in the can and you put it on there—don't have your painter match it or take the time to match the color.

**CHAIR SPEIER:** So your car will have two different colors, in effect, on the car?

**MR. WALKER:** Yes. There will be two different colors if you don't spend the time to match the color.

**CHAIR SPEIER:** Is that reasonable, Mr. Cignarle?

**MR. CIGNARLE:** Absolutely not.

**MR. WALKER:** On all my complaints, the insurance companies, when they come to my shop, they come out and they look at the car and try to write an estimate. Some of them do five to six estimates on a car. And they cannot get them right. Ninety percent of the adjusters that are coming out there are not qualified to write an estimate on a car. And they come out there and they tell me how to repair a car; how to fix it; and what they're going pay me; and what I can charge.

The labor rate is just a fifth of the issues that I have. It's them telling me how to repair the car and what they're going to pay me. They're estimate will be $2,000; mine will be $10-. When we're done, it will be up to $8,000. There's $2,000 difference--$300 will be labor rate and the rest things that they don't pay for because they can get it done at the direct repair shops.

If you subpoenaed their call records, that's the best thing in the world that can be done. Or if you'd like me to bring 200 customers to Mr. Garamendi and Cignarle,

SENATE COMMITTEE ON BANKING, FINANCE & INSURANCE

I'd be happy to, to tell them what the insurance companies are telling my customers—"You cannot go to that shop because they're not on our list. They charge too much; you'll have to pay the difference."

I have cars that are sitting for three weeks to a month before they'll come out and look at them. Anything and everything to inconvenience the customers.

The only time they pay me is when we go to small claims court, the customer happens to be an attorney—writes a letter, or, I have a couple of cars in there now that I'm redoing from the direct repair shops. Now, they'll pay me. I have a customer in there who has Triple A Insurance and they told her, "You cannot go to PJ's Body Shop. No matter what, you cannot go there," so she didn't go there. She went to their preferred shop. And now her car is unsafe to be on the road and unsafe for her to drive, so I'm going to be doing an estimate on it and redoing here car. And now they agreed to pay me my labor rate and my procedure to repair the car.

All they had to do is subpoena the car records, monitor my phone calls, and you can see what the adjusters are doing and how they practice.

**SENATOR COX:** How many repairs a month?

**MR. WALKER:** I do approximately 15. From 80 to 15. I'm 15 now.

**SENATOR COX:** How many companies are you considered to be a...

**MR. WALKER:** Zero. None.

**SENATOR COX:** Zero. Okay. All right. Thank you.

**MR. WALKER:** When I was a direct repair shop, for 25 years, the first one in Sacramento and the longest one, after I filed my first complaint with the Department of Insurance, the insurance companies started blackballing me. And I had three insurance companies I was a direct repair for, and I'm no longer a direct repair. And I went from 21 employees to five.

**CHAIR SPEIER:** Mr. Walker, do you believe that the reason why the department doesn't get more complaints is because of the fear of blackballing?

**MR. WALKER:** Absolutely. I talked to my fellow body shop owners, and they'll tell you. If we all get into a room together, they'll tell you that they will be blackballed and be cutoff tomorrow. Insurance companies told me, Infinity has told me, if you challenge us, you will lose. The last shop that challenged us, we put out of business. Several insurance companies were telling me, you challenge us, you'll

lose.

**CHAIR SPEIER:** Mr. Cignarle, do you believe that there's truth to that? Do you think these auto repair shops may, in fact, be blackballed?

**MR. CIGNARLE:** Sure. Absolutely, I believe that the fear is there that they will be blackballed. And, I mean, to be perfectly honest, it happened to my father and he's been a longtime body shop owner. I'm very well aware of the concerns being brought up here. And notwithstanding that, I mean, we look at what the evidence is presented to us, and we determine whether a violation has occurred or not, and that's kind of where we are now. We're taking action on the cases that we are able to verify and prove and not taking action on the ones where the evidence either leads us....either dries up or leads us to suggest that the transactions were legitimate, or if there is a violation, we can take enforcement action.

**CHAIR SPEIER:** All right. Thank you. Next.

**BRENT VANCE:** Hi. I'm Brent Vance. I'm vice president of G & C Auto Body.

**CHAIR SPEIER:** Since G & C has had a lot of time, let's be very brief.

**MR. VANCE:** I'll be very brief. I'm to address Senator Cox. I am usually the one who goes with the consumer to small claims court and argue the labor rate issue or paint capping issue for the consumer, since they have no personal knowledge of that aspect of our business.

I have here the actual regulation regarding the labor rate survey. And according to this, there's no signing under penalty of perjury that this labor rate is fair and accurate. There's no enforcement. There's no verification. All the Department of Insurance does, is take this and put it in a file cabinet and then when a consumer or shop wishes a copy of it, they provide a copy at a nominal fee.

**CHAIR SPEIER:** Is that true, Mr. Cignarle? Do you audit the labor rate surveys done by the insurance companies?

**MR. CIGNARLE:** We don't do as what was suggested. What we do is, we get the surveys in; we examine the surveys to make sure that they do, in the four corners of that survey, are valid surveys according to the statute and/or the regulation. And specifically when we do get complaints in, we will look at....we may drill down further into that survey if the allegation is that they use DRP rates in their survey. They're allowed to use DRP shops in their survey, just they can't use that discounted rate in their survey.

G&C 00705

SENATE COMMITTEE ON BANKING, FINANCE & INSURANCE

**CHAIR SPEIER:** But if in fact, some of these shops have virtually no equipment. I mean, how would you know that?

**MR. CIGNARLE:** There's no provision that requires the insurance companies to use only high end shops. I would assume that....there are currently 4,000 shops licensed with the Bureau of Automotive Repair. I assume that they're all following the law and are able to perform work on these vehicles in a workman like manner. If a shop is not, and they are using the survey, then it's something....for example, if they don't have a frame machine and there's frame time, then that frame time should be added.

**CHAIR SPEIER:** All right. Someone just put these pictures up. Are these auto body shops that were on the actual surveys? Have any of these...

**MR. VANCE:** That is correct. Now, State Farm has kind of a different twist on this. They claim not to have a direct repair program, but a service first program, in which shops receive no referrals, however if you're on their program, they will allow your customers to come to you. They send out a letter to....this is their survey letter: *Please indicate your crisis charges for State Farm customers. This information is intended to be confidential to State Farm.* I pulled their survey—90 percent of the shops on their survey are service first shops. These are some of the other shops that are on their survey in which our shop is compared to and, you know, for these shops at $74 labor hour is probably very reasonable as put forth—very low overhead, no equipment...

**CHAIR SPEIER:** Those shops don't mean a lot to me. Tell me what's good, bad, or indifferent about those shops.

**MR. VANCE:** Well, if you see the top one, this top picture is a homemade spray booth. Obviously this booth has been grandfathered in through building codes, but it is not up to the standards that it takes when I have to install a new spray booth, since I have five booths. And I have to go through the fire codes, a qualified electrician to wire it. I'll spend like, $50-, $60,000 for the booth and another $60,000 to get it licensed and installed.

You see the picture down below there, that is the gentleman's booth is the five-gallon paint can with the fan sitting on it—is his spray booth. And then you see the other shops there. They're office is a little trailer sitting on the property and has the word "duck" on the door threshold because it's very low and if you're tall, you have

to duck to get in. These shops are what State Farm uses to set the prevailing labor rate in our area, is what these shops are.

And I feel that the labor rate survey shouldn't be to set a specific rate, but a range of rates. You have your shops that can work on the '57 Chevy because they have the technology for that, and then you have the vehicles, the 2005, 2006 vehicles, where I need three dimensional computer lazar measuring systems, I have to have the scan tools...

**CHAIR SPEIER:** I understand. All right. Thank you. Any last words?

**MR. VANCE:** Yeah. In small claims court, I was just there last week, for a State Farm case, and I explained to the judge that this actually is not a survey, but a commercial agreement with these shops submitting this information. And she agreed with me. State Farm argued, "No, no. We have a survey." But the judge said, "But your survey is skewed. You asked the wrong question. You didn't ask, what is your labor rate? You asked, what will you do State Farms work for? Therefore, creating an informal commercial agreement with these shops."

**CHAIR SPEIER:** And was State Farm there representing...

**MR. VANCE:** Yes. There was an attorney for State Farm sitting in the back. There was a claims supervisor from Rohnert Park. An adjuster from an area....we were doing this in Marin. And they actually were there arguing for State Farm.

**CHAIR SPEIER:** And the judge ruled?

**MR. VANCE:** Which surprised me, the judge ruled right then and there for the consumer, saying, "You will pay this consumer the money that she put out of her pocket to get her car repaired.

**CHAIR SPEIER:** And how much was that?

**MR. VANCE:** It was $1,800.

**CHAIR SPEIER:** All right. Senator Cox.

**SENATOR COX:** Let me just ask a question. I didn't ask the owner of the firm, but perhaps you know. But he indicated you do about 600 repairs a month and you have 12 direct providers. How many of those 600 are, in fact, with direct providers, do you know?

**MR. VANCE:** It would be hard to guess. About half.

**SENATOR COX:** Fifty percent. Okay.

**MR. VANCE:** And we do charge our off the street rate to every consumer or

insurance company that we do not have a direct repair for. I don't know where...

**SENATOR COX:** Tell us what you mean by that.

**MR. VANCE:** Well, as Cignarle was saying, that shops don't necessarily charge their shop rate, but who's telling Cignarle that we're not charging our shop rate.

~~**SENATOR COX:** You need to address this.~~

**MR. VANCE:** Exactly. So, who is saying they're not charging their shop rate? I charge my shop rate. Every shop I know of, charges their shop rate when they don't have a contractual agreement with an insurance company.

**SENATOR COX:** And that's the rate you've posted/

**MR. VANCE:** That's the rate we've posted.

**CHAIR SPEIER:** Well, I think, consumer protection would suggest that the rates you post is the rate you charge.

**MR. VANCE:** Exactly. And our rate is not higher than other prominent shops in our area. We're actually lower right now.

**CHAIR SPEIER:** I mean, you go to a hotel and they always have what they all the rack rate, right. And they have relationships with other entities that then give them a different rate.

**MR. VANCE:** Just one quick comment on the labor rates. The dealers in our area charge about $140 an hour. Body shops are about $90, so you have a $50 difference. An independent mechanical garage charges between $120 and $100 an hour. Now when we do body work we're not only just straightening fenders, but we're doing mechanical work also. So my body men have to have the tools for doing body work and the tools for doing mechanical work. Why is it that body labor rates are so far below the other service industries anywhere? I mean, the guy who fixes our computer comes in with a little briefcase of software, he's $140 an hour.

**CHAIR SPEIER:** All right. I don't think we can get into that issue today.

**MR. VANCE:** Exactly.

**CHAIR SPEIER:** All right. Thank you. Next.

**JAMES BOYLE:** Thank you very much for having us here, Senators and everyone here, to address our industry's issues. My name is James Boyle, and I'm the owner of Regal Collision Repair in Vallejo, California. And I'm also the president

of the East Bay Chapter of California Auto Body Association.

And I'm here to tell you I'm one of those business owners in the collision repair industry that has not had the guts to get a consumer to file a complaint against their insurance company just because the relationship that we need to maintain with these insurance companies is such that we can't go in and fight them. And this is a tough enough issue in itself to have had your car in a major collision, or even a minor one, and then go through these processes that you have to go through, and then in the end, to quibble over $2, or $3, or $5 an hour. They just don't want that. It's just easier for them to go to one of the shops that will agree to do the work for the insurance company's rate.

So, I'm embarrassed to say, I've never filed a complaint. Because I can't file a complaint. It has to be the consumer.

I think Mr. Garamendi's office will get quite a bit more response to this issue of steering and labor rate if he could hear from the industry. But he has to hear from the consumer. Consumers don't want to go through that.

**CHAIR SPEIER:** All right. Thank you. Next.

**SENATOR COX:** How many repairs?

**MR. BOYLE:** My business does about 45 repairs a month.

**SENATOR COX:** And how many are with the direct...

**MR. BOYLE:** And we have two direct repair relationships.

**SENATOR COX:** Okay. But how many of the 45 come from the direct repairs?

**MR. BOYLE:** Thirty-three percent of my business is customer pay, and we do charge our posted labor rate.

**CHAIR SPEIER:** So without your direct repair program you would be hurting?

**MR. BOYLE:** I would absolutely be hurt. This is quite a risk for me to get on the microphone and say that I would like a true assessment. We're business people. We learned sometime ago that the proper way to set your rate is to find out what your break even point is—what your cost of goods sold; your cost of payroll; and that, your rent, all of those things that factor how a business should set a rate, and we're not allowed to do that.

**CHAIR SPEIER:** All right. Thank you. The next witness.

**BLAKE ANDROS:** Hello. My name is Blake Andros. I own Blake's Auto Body. I have four stores. We do over 600 repairs a month. And with the kind of

**G&C 00709**

volume I do, I guess there's some luxury in volume.

I've listened to everybody here. I haven't heard anybody speaking any untruths. But, I think I better ask you if you have any questions for me, because you didn't get the answers to some of your questions today. I'd like to answer them.

**SENATOR COX:** How many direct provider...

**MR. ANDROS:** Fifteen.

**SENATOR COX:** So you do 15. And how much of your business is done with the 15?

**MR. ANDROS:** Ninety percent.

**SENATOR COX:** Ninety percent.

**MR. ANDROS:** You mentioned balance. The people behind us have to balance out the insurance companies. They have to balance out repair costs.

The reason why we're at 90 bucks an hour posted rate and mechanics shops earn a buck-40 is because the insurance companies control us. Okay, most mechanics shops, independents, are three, four, five people shops. Dealerships don't run as many men as I do. I run 90 employees.

**CHAIR SPEIER:** And you have a posted rate of $90?

**MR. ANDROS:** My posted labor rate is $88 right now.

**CHAIR SPEIER:** Your posted labor rate is $88, and the direct repair programs that you are with are paying you what?

**MR. ANDROS:** And average of $72. I met with an insurance company last Thursday, and we discontinued our relationship because they allowed me a $64 labor rate increase from $62. I can't work for $64 an hour in the town of Novato in Marin County. I don't make any money. They don't care. We give them discounts on paint, material, supplies, we give them discount on parts—typically 10 percent. Once again, I keep my mouth shut because I do $12 million of volume a year. There's a luxury in that. And I've been in business, I started my 26th year Tuesday last week.

**CHAIR SPEIER:** So what do you think the answer is?

**MR. ANDROS:** Balance. It's hard. Very few of us, the top 20 percent, spend...

**CHAIR SPEIER:** No. We've been dealing about this issue from the consumer's perspective.

G&C 00710

**MR. ANDROS:** That's a hard question. Balance. What's really the answer?

One of the problems that Mr. Crozat has, and we're enemies. We are business enemies. I met him for the first time today. We compete in every market.

**CHAIR SPEIER:** Well, you've been very cordial to each other. No fist fights.

**MR. ANDROS:** We don't dislike each other, but we're business enemies. Geico puts all their work into my shops.

**CHAIR SPEIER:** Obviously, yeah.

**MR. ANDROS:** Obviously.

**CHAIR SPEIER:** We saw that today.

**MR. ANDROS:** It's a touchy subject, okay.

**CHAIR SPEIER:** It's going to be more touchy, I think.

**MR. ANDROS:** It's funny how, if I'm considered in the top 20 percentile in the United States for body shop owners, how I never get a call from the Department of Insurance. Maybe they should call and ask me some questions. Maybe I can help everybody. But, it's scary. I don't know what to do. What's the answer? Well, that's what we're here for—trying to find it.

I have a posted labor rate, but when they do the surveys, the posted labor rate never shows. It never pops up.

**SENATOR COX:** What's your posted labor rate?

**MR. ANDROS:** Eighty-eight. And I stretch from Marin County, San Rafael, Novato, Rohnert Park, to Santa Rosa.

**CHAIR SPEIER:** Do you think maybe the department should do the labor studies instead of the insurance companies?

**MR. ANDROS:** It would be honest then.

**CHAIR SPEIER:** Yeah. It makes a lot of sense to me. What do you think about that, Mr. Cignarle?

**MR. CIGNARLE:** Well, our opinion on that is that just as the Department of Insurance is responsible to do data calls with its licensees, insurance companies, agents, brokers, etc., we believe that the entity that regulates body shops is more appropriate, the Bureau of Automotive Repair, to do data calls with their licensees, the body shops.

**MR. ANDROS:** I believe Mr. Crozat actually recommended that.

**CHAIR SPEIER:** But with all due respect, you're relying on this labor survey

to make decisions whether or not there's been steerage, or whether or not there is reasonable rate being charged, and whether or not a consumer is going to make up the difference. So you're relying on that. So regardless of whether it seems like the regulator of auto body shops should do it, it's a measurement that you're relying on and you're taking...

**COMMISSIONER GARAMENDI:** Senator, they, the body shops, are licensed by another agency, and if they present the information to us, yes, we will rely on them.

**CHAIR SPEIER:** No, but the insurance companies are doing a labor survey.

**COMMISSIONER GARAMENDI:** No, I understand. But your question was, should we do it? And we're saying, no, I don't believe we should do it. It should be done by the Bureau of Automotive Repair.

**CHAIR SPEIER:** So you do agree that maybe we shouldn't have the insurance companies doing it?

**COMMISSIONER GARAMENDI:** I'm sorry, I couldn't hear your question.

**CHAIR SPEIER:** Do you then agree that maybe the insurance company should not be doing the labor surveys?

**COMMISSIONER GARAMENDI:** There's a lot of questions that have been raised about the labor survey. If the Legislature wants somebody else to do it, then fine, do it. I believe the best place to have it done is with the Bureau of Automotive Repair. If you want to introduce a bill that provides for us to do it, then, we'll do it. But I give you my opinion, it's best done by the Bureau of Automotive Repair.

**CHAIR SPEIER:** Well, I guess I don't want to beat this to death, I just think that if it's flawed and you're relying on it...

**COMMISSIONER GARAMENDI:** Senator, I just gave you my answer. You asked me who should do it—the Bureau of Automotive Repair.

**CHAIR SPEIER:** All right. Okay. Thank you. One last comment? Yes.

**MR. ANDROS:** Probably what's really bringing all this up is our overhead just went up skyrocketing—rents, PG&E bill.

**CHAIR SPEIER:** Paint? Did paint go up for you?

**MR. ANDROS:** Oh, yeah. PG&E, I had one shop, $6,000 last month for PG&E. So we're struggling. You know, all my employees want more money. Everybody needs more money. So, typically, a restaurant might raise their prices.

People come in or they don't. We are not allowed to raise our prices. That's the real problem.

**CHAIR SPEIER:** Say that again.

**MR. ANDROS:** We are not allowed to raise our prices. How can I raise my price? I can't.

**CHAIR SPEIER:** If this is someone who is in direct competition with Mr. Crozat, he's the one who gets all of Geicos' business and he just said, "I can't raise my prices." It's fixed.

**COMMISSIONER GARAMENDI:** Change the law.

**MR. ANDROS:** Bingo.

**COMMISSIONER GARAMENDI:** Change the law.

**CHAIR SPEIER:** Mr. Commissioner...

**COMMISSIONER GARAMENDI:** I can only work within the laws that this Legislature is giving us.

**CHAIR SPEIER:** Mr. Commissioner, I recognize that. And you have been very...

**COMMISSIONER GARAMENDI:** And I've given you one thing. Take it to the Bureau of Automotive Repair. Let them set the labor rates. Let those people do the studies. And if the bill comes out of this Legislature that the Department of Insurance should do it, I can assure you that the Department of Insurance will do the very best it can to set the rates. But at the moment, the law is the law.

**CHAIR SPEIER:** All right. The next witness, please. Thank you, sir.

**TODD BALLENGER:** Senators, Todd Ballenger. I'm the manager/part owner of Anthony's Auto Crafts in San Rafael. I've been a manager there, owner, for 19 years. And what you've heard here today is true. It's not just a G & C issue. It is multiple shops. It's every shop that I'm familiar with in my area.

Again, the labor rate survey, things were different probably three, four, or five years ago, I know, when the bill passed.

**CHAIR SPEIER:** Sir, can you please speak into the microphone.

**MR. BALLENGER:** Yeah. I know when the bill passed about three or four years ago, I had an insurance company, Allstate, approach me and they had been paying my door rate; my labor rate, which was $88 an hour now, then it was probably about $85 an hour. And they said...

G&C 00713

**CHAIR SPEIER:** Five dollars less an hour.

**MR. BALLENGER:** Yes. So they said, "There's going to be a problem with your estimate. We're going to adjust the labor rate to $75 an hour," $10 an hour off. I said, "Well, I don't understand." "Well, there's been survey done," I could tell by the look. There were two supervisors out. I could tell by their look that something had changed; somebody found a loophole. And they said, "This is what's going to happen. We're going to do this. We know this is going to become an issue in the future, but for now, we're going to do this. There's nothing you can do about it. You're can accept the $75 an hour." Now, that was one company. I can tell you in the last three years, I've had multiple companies jump on the same bandwagon and all start to dictate my labor rates.

So, I've just of late, where I tried to charge them paint materials. They explained to me, that no, that was part of my overhead. That shouldn't go in paint materials. And I said, "Well, wait a minute. How can I increase and cover my overhead, my labor rate is being controlled by you? You've capped my labor rate.

So, this is absolutely true. We're a completely regulated industry as of....well, forever, but more so now than we've ever been.

We have a lot of horsepower at our shop. We do 200 collision repairs a month. We do premiere cars. Our clients are able to pay the difference, and many times pay the difference and don't fight this. I made a couple of complaints initially with the Department of Insurance on the internet, when it came available, nothing ever came about it. I find it hard to believe that there's only four shops that have complained. I could make 20, 30, or 40 complaints tomorrow if I thought they were going somewhere.

So the survey...

**CHAIR SPEIER:** You never got a response back from the department?

**MR. BALLENGER:** No. No.

**CHAIR SPEIER:** No letter?

**MR. BALLENGER:** This is on the internet. When that first came available on the internet and I was informed by, I'm not sure who. I don't recall. But I went ahead and made that complaint and nothing ever came of it.

Now, I've got three cars in my shop right now that people are going to pay upwards of $1,500 out of their own pocket. One of them is an attorney and says

they want to take this up further. But I can tell you, is this happens day in and day out. I can never increase my costs. If this survey is going to actually work, what are the parameters? What are the limitations? When is it going to be readjusted? When are we going to have an outside, non-bias force come in and say, "Okay, insurance companies, now it's time for you to reevaluate the labor rate."

**SENATOR COX:** So how many agreements do you have? You said 200...

**MR. BALLENGER:** I have one, and I have one with State Farm which is technically not a direct repair. It's just a contract saying that I have equipment to repair cars properly.

**SENATOR COX:** So you've got one and you do 200 repairs a month. How much comes from State Farm?

**MR. BALLENGER:** State Farm is a small percentage; maybe five to seven percent. But Triple A is a company that I do business with and it's probably 25 percent of my work comes from them.

**CHAIR SPEIER:** Is that a direct repair program arrangement?

**MR. BALLENGER:** That's the only one I really truly have that's contractual, yes.

**SENATOR COX:** So it's 25 percent?

**MR. BALLENGER:** Yes.

**SENATOR COX:** So that's 50.

**CHAIR SPEIER:** All right. So, you were told that you couldn't charge the paint; is that what you said?

**MR. BALLENGER:** The paint materials now, yes. I'm told that it's going to be capped. I have to show billing, and that changes weekly, I've got to tell you as of late. I now have a program that will allow me to show a bill that basically will dictate how much; what you're doing to the car; and it will dictate a dollar amount. That worked for a short time. Now they're telling me, "No, we want actual receipts from your paint supplier," because they know that's impossible.

We purchase right now, $350,000 a year in paint materials. I do it in bulk purchases. I do it in $4,000 purchases a week. And so, there's no way for me to separate one car....I mean, I can do it. I've done it in the past to fight this, where I've actually purchased paint materials specifically for that car, but obviously that's going to increase the cost on those paint materials for that car, increase the cost to

**G&C 00715**

the consumer, to the insurance company, to everybody.  So, there's no out for me.  I'm not in control of what I charge.  That's been totally dictated now.

**CHAIR SPEIER:**  All right.  Thank you.

**MR. BALLENGER:**  Thank you.

**CHAIR SPEIER:**  The next witness.

**SHEILA WALKER:**  I've known this gentleman since he was eight years old.  My husband actually taught him to paint a little bit.  He worked for his dad before he went into business.  To sit here 26 years later and hear about surveys, unethical practices...

**SENATOR COX:**  And your name is?

**MS. WALKER:**  Sheila Walker from PJ's Auto Body Shop in North Highlands.  I own the property there.  And if I didn't, I'd be out of business because they've come to us after we decided we wouldn't conform, be dictated, controlled, and follow by the rules, that they'd put us out of business.

Well, when my husband and I started, I was 20, he was 23, and we kind of were rebellious people and didn't like taking orders from people, so that's why we went into business.

Well, we didn't want to be dictated and controlled, but they did prove to us they will put us out of business because we're not following by the rules.

Well, my husband and I have been part of your bill from the beginning in representing steering.  It's all about steering.  It's all about control.

Four thousand shops, how many millions of people are in the state of California speeding into 4,000 shops when really about 20 percent are fixing those cars correctly?  Why?  Because they're here today to finally say, after two-and-a-half years, they're going to go broke because they're controlled.

My husband and I didn't want to be controlled.  So to downsize it cost me a half a million dollars, I'm not making any money, but I'm happy.  Because I've got another plan.  My plan is, I'm going to retire as a landlord.  That was my plan.  That's why I owned six acres, 37,000 square feet, and I go home at 5:00 every day.

I work because I want to and choose to now.  I can walk away and retire today with about $30,000 a month income, so I don't need to work.  I'm here today, to tell you, that if you work real hard, do things right, and do what you're supposed to do, which is follow the law.

**G&C 00716**

Insurance companies, we all know, contribute a lot of money to a lot of people. We're not dumb. We were mentored by them. We walked away, when they wanted us to be crooked, do things unethical, and then they come up with labor surveys.

Labor surveys have been around since....I can remember State Farm coming out to my business and say, "John, fill this out. Tell us what you're charging."

Direct repairs have been around about 15 years. We were one of the first ones to be on that program because you had to be an elite group of people; you had to have the best equipment; you had to have the best reputation; they wanted owner occupied; they want to see your P & Ls; and they didn't give you written contracts then. They believed in what you were doing. They changed because they want to control our industry like they do other industries.

And what happened is, they were sold on something to tell them, "We're going to give you all you can handle. We'll make you more money. You can retire in five years. You just do what we tell you to do." They were sold on something—they had to sell themselves, their ethics, their families, their beliefs, and the actual repairs that they do on cars in order to pay their overhead. It's finally come to a head.

Thank you for making the Anti-Steering bill law, Jackie. Because as woman to woman, you done something for me that nobody hasn't done in 26 years. And the reason why, is because you know the consumer is not being treated fairly. And the reason they're not, is because the insurance companies control our policies. They'd change those if they could get that done.

But the reality is, our Department of Insurance is hand tied between the insurance companies and the consumer. They tell us as business that we have right to complain, but they tell us then that we don't have a right to complain when we do.

The reality is, what happened to free enterprise in this country? If I post a rate, you say it's not a posted rate. But what is the prevailing rate? But what is the DRP rate? The rate is what's in the Mitchell Manual, ADP and software companies it stipulates how the car is supposed to be repaired back to the condition it was new. That's what we charge for. They went in and masterminded their plan to figure out how they don't have to pay for it because they can cut corners, change the software, do everything. The reason why is because, they like their bonuses, and believe me, they work real hard for them.

G&C 00717

**CHAIR SPEIER:** Okay. Thank you very much.

**MS. WALKER:** Thank you.

**CHAIR SPEIER:** The next witness.

**LEE GAMBOA:** My name is Lee Gamboa, from Gamboa's Body & Frame. We have three shops in the area. We do about $12 million a year in business. We employ 84 people.

I have got three things that I would like to address, which they've already gone over and over, but the labor rate survey being one. How can Allstate come up with $62 an hour and State Farm come up with $70 an hour in the same geographic area? I believe that the information to use on the surveys that are gathered are phony. They're construed to come up to look the way the insurance want them to come up to.

Having one of the largest shops in probably Northern California, I've never once been asked what my labor rate was by an insurer. You would think they would want to talk to the owner/operator of the business, but they don't, other than State Farm in which they send an annual survey.

And I've also had insurance adjusters come in and say they've had a survey when they do not, because I know who has a survey. I've been up on this, and I follow it, and I'm involved with our association. And they just lie so they can get the labor rate, or pay the labor rate that they want to pay.

And the steering issue, I don't think there's a person in this room that doesn't work for an insurance company that knows what the extent of the steering is because those people never come to our door. They never make it to the shop because they're first point of contact is their insurance company.

And every case....I know a lot of people in this town. My mother, my general manager's wife, my neighbor, my best friends I've been best friends with since high school, they've all been steered. And those are the ones who will talk to you about it. The rest of them never show up.

My general manger's wife had her car broken into and when she called Farmers Insurance, they told her she couldn't come to Gamboa's. And when she asked why, they said, "Well, they can't get to you. They're so busy. They may not be able to even look at your car for six weeks." And when she said that she thinks she'll be able to get in because she's married to the general manager, then they

started doing a little bit of back pedaling.

But, I haven't heard anything untrue from any of the shop owners here. And I hate to say this, but you know I thought....in January 01 of '04, I took the legal recourse. I'd never made any waves before that. I started filing the complaints as we were allowed to do so. And I got to the point where I was getting a form letter. The same letter from every one.

**CHAIR SPEIER:** You filed complaints with the Department of Insurance?

**MR. GAMBOA:** With the Department of Insurance. And then I started saying, okay, I'm not going to shotgun them and give them a complaint for every case. So I didn't pay my labor rate or capped materials. I'm just going to focus on steering. And I'm not going to just focus on steering, I'm going to focus on the ones that are just over the top—cut and dry case. And have not had one followed...one action taken.

I've even had a customer, we went to the same gym and I ran into him. And I said, "I remember you. Mr. Hannon. You're the one who sent me the note about the steering." And he said, "Yeah. Yeah, I did." He said, "You know, that adjuster told me that Gamboa's Body & Frame is not knowledgeable in repairing collision damaged vehicles." I'm second generation. We've been in this town since 1972. We're pretty knowledgeable at repairing collision damaged vehicles. And there's numerous cases like that. I've included some of them in a binder that I presented to Mr. Steffen.

And I'm done. I'm not making anymore complaints, because they don't get handled. I'm hesitant to be here because our business has been retaliated against for taking legal recourse. We're $1.2 million down over last year and the year before. So it has affected our business. We've had to lay employees off. We've had to cap insurance for medical coverage. We've cut down to almost a skeleton crew. We've had to layoff mid-management layers. We've had to get rid of people in the office. You know, if someone calls in sick, it's a disaster almost because we don't have anyone to cover for it. And we've just been bad-mouthed by the insurance company.

So I'm done with it. I won't be filing anymore complaints. I won't be talking to Mr. Cignarle. I've tried to get a hold of him and written him letter personally. I do not want to battle with any insurance companies. But I've got 84 people that count

on me to do the right thing and keep the business out of harms way so they can get a paycheck every week and feed their kids.

And I won't be making anymore complaints because it's hurt our business. And I was real hesitant to come here today, because I'm pretty sure that there may be some impact on my speaking and identifying myself.

**SENATOR COX:** How many repairs a month?

**MR. GAMBOA:** Four to 500.

**SENATOR COX:** And how many direct repair programs do you have?

**MR. GAMBOA:** One.

**SENATOR COX:** So you only have one now. And so you're getting....how many does that one provide you with then?

**MR. GAMBOA:** Probably about $200,000 worth of business a month.

**SENATOR COX:** I'm really looking for...

**MR. GAMBOA:** Amount of vehicles? That would be about 85.

**SENATOR COX:** Eighty-five percent?

**MR. GAMBOA:** No. Eighty-five vehicles.

**SENATOR COX:** Eighty-five vehicles, I see. Okay. So roughly 20 percent give or take some.

**MR. GAMBOA:** Give or take. That's a close number.

**SENATOR COX:** Thank you.

**MS. WALKER:** I'd like to make one last comment.

**CHAIR SPEIER:** Yes.

**MS. WALKER:** The only reason I came here today was because I'm hoping that we can still focus on the steering because these surveys are being used to control.

Another thing, they've got you guys all sidetracked over here worrying about surveys, when it's all about steering. Controlling you and steering you and dictating to you. And the Department of Insurance has to come up with a better way to investigate not only the surveys, but let's do subpoena one or two of these insurance companies. And I would love them to do it on my phone, because every customer is steered away.

**CHAIR SPEIER:** All right. Thank you very much. All right, we're going to take a five minute break and then we will return. Thank you.

**G&C 00720**

Allen Wood is here, formerly with the Bureau of Automotive Repair—now retired. He has been working in conjunction with Mr. Crozat. But I do think he has an independent perspective, having worked, how many years with the Bureau of Automotive Repair?

**ALLEN WOOD:** Thirty-three years.

**CHAIR SPEIER:** Thirty-three years. So if you would like to briefly give us your comments.

**MR. WOOD:** Madam Chair, Senator Cox, I want to thank you for allowing me to be here today. What we obviously have here, is a process that's basically out of control, and I think that's pretty obvious.

**CHAIR SPEIER:** Can you speak into the microphone?

**MR. WOOD:** What we have is a process that's basically out of control in the three areas that we discussed today. I think it's highly commendable, and I think it should be noted, that for these shops to come forward is just a tremendous undertaking on their part. The issue of retaliation and the consequences are serious. And for them to come forward, it's a first. So, I think if nothing else, your hearing has been successful and I would commend you on at least allowing them the opportunity. And I would hope that when they leave, that what they've presented, that there isn't retaliation or anything goes any further than that. I mean, they're speaking their peace and they've really got some sincere issues.

Along the lines of the three issues that have been discussed today, I think the issues of the paint capping is pretty obvious and straightforward and I don't want to take any time on that.

But, when it comes to steering, it's an issue that, I don't think that any one of these shop owners that came here today isn't willing to go out and compete for the customer. And I think the same thing applies to the insurer. I don't think any one of them would say that if this insurance company, if the customer hasn't chosen a shop, that the insurer shouldn't be able to help them make that decision. But unfortunately, it's been taken one step further. And there has to be....it's the old adage, "what gets measured, gets done." There has to be some regulatory effort in this area so that if a customer indicates that they've made a determination as to who they want to have their car repaired, that those statements that are used should be stopped at that point and allow the marketplace then to control itself and compete

G&C 00721

for these people and these customers, instead of steering them away.

Some of the very things that the insurers are required to do are the things that they're using to steer the customers away. To say that an adjuster can't come out for a week is a form of steering. There's just a litany of statements that go on, and one can lead to another. "That shop's not on our list," there's connotation of maybe there's something wrong with that shop. "You know, you'll have to pay the difference in cost out of your own pocket." If you look at the statutes, it doesn't look like that was what the intent of the law was when people were entering into these agreements for insurance and have their car repaired. "We won't guarantee the work." Well, I don't know that the insurers are doing the work, it's really the shops that extend the guarantee, and every one of these shops, I think that testified today, will say that they guarantee their work irregardless of who they're working on their car for.

When it comes to steering, it just takes the competitive edge away from the business person. And you can see the frustration in the people that have testified today, to what extent they've gone. It's that old adage, "I've had enough and I just can't take anymore."

When it comes to the issues of setting labor rates, one of the things that everybody must first understand is, there's no requirement in this state for anybody to post a labor rate to start with. And there's a big difference, and I don't think that anybody is intent here is to do away with commercial business agreements. If somebody wants to discount their wares and repair vehicles or whatever for a discounted price, they should be able to do that. But along with that comes such things as being afforded other benefits. Maybe it's volume of work. I'll discount my work by $20 an hour if you send me x-number of vehicles. It's when you don't have that relationship, that these companies try to impose those same standards on the repair, which creates a problem.

You might ask yourself, well, what is the outcome of this? Well, one of the biggest outcomes is, somebody has got to pay, and it's usually the consumer. And they pay in the form of either a substandard repair, or maybe a part charge that's not put on the car, or a labor operation charge that isn't done.

If you look at labor rates in Southern California, they're about half of what they are in Northern California. But the cars, when they are repaired cost the same

G&C 00722

to repair, and sometimes even a little bit more. And what is done, in Southern California a one hour fender is charged out at two hours or maybe even three hours. It's a form of cost shifting in order to makeup the difference.

The shops are struggling with the inflation rates that we're involved in, and they have to have some release. You've all heard people say, "I can't raise my rates."

One shop owner told me one time, he says, "I follow the Golden Rule." I kind of looked at him and thought, "Well, I know what that is." And he said, "No, you don't." He said, "The Golden Rule is, that the insurance companies have the gold and they make the rules." And that's really the way it works out there. And there really has to be something done.

The industry, it's ironic. We have a real love/hate relationship here. The insurers need the shops to fix the cars. But yet, I think you can see, they're just getting pushed to the point where they can't really function at that level anymore. They've cut everything they can. They've absorbed everything they can. And when you look at the regulatory influence that the Bureau of Automotive Repair has over the repair industry, to cost shift, or to charge for job operations that aren't done, subjects their license to discipline and can have an extreme consequence to them. So, it would be hopeful that there would be some common ground reached so that these two parties can come together.

Personally, I think that having the Bureau of Automotive Repair collect some of the data regarding labor rates would be a good idea. You first have to establish the requirement to have one. We should talk about retail labor rates, and not commercial business agreements. And that information should be public information. I don't know that you have to have a state agency to do the survey, because if you know what the data is, anybody could do the survey—if it's public.

When it comes to steering, I think that's the one area where it's a bit of a challenge. Once the consumer indicates that they have made a choice, I think that's when the insurance industry has to say, "Fine. You can take your car there." To continue on with that dialogue, to say that they're going to be delayed, the adjuster can't get out there, that the survey shows the shop charges too much money, those are all things that are detrimental to the process.

If you have any further questions, I'd be glad to answer them. But I hope that

that is a bit of a summary as to what I have seen today. And it's just a shame that the two parties can't get together.

**CHAIR SPEIER:** Well, maybe we can help them get together.

**MR. WOOD:** I would hope so.

**CHAIR SPEIER:** All right. Thank you.

**MR. WOOD:** Thank you.

**CHAIR SPEIER:** All right. I think we've concluded....yes, Mr. Cignarle.

**MR. CIGNARLE:** Just one update. We had spoke previously regarding, or the committee spoke about, and Mr. Crozat, about Geico. We weren't able to provide with you any detailed information. However, I was just informed that we have filed an accusation as of Friday against Geico on this specific issue, and that will be moving forward.

**CHAIR SPEIER:** All right. Thank you. That's good news. Do any of the insurers want to address us on this issue? Mr. Sorich does.

**UNIDENTIFIED:** He's very brave, because he may never get his car fixed again if he testifies.

**CHAIR SPEIER:** No, he knows exactly where he's going to take his car. It's to a direct repair shop.

**SAM SORICH:** Madam Chair, members of the committee, Sam Sorich with the Association of California Insurance Companies. And just briefly, I would just point out, that our responsibility is to our customers and claimants. That's where our responsibility is. We want to make sure that cars are repaired properly and safely.

Our primary responsibility is not to keep repair shops in business. We want to make sure that the insurance benefits available are enough to repair cars, but it would be a mistake to require us to use the posted rates. The Department of Insurance's regulations require insurers who choose to do labor rate surveys, to use the rates charged. The rates posted, if we were to do that, would allow the repair industry to dictate rates that are unreasonable and too high.

**CHAIR SPEIER:** Why do a survey at all? Why don't we just have the individual customer go out and get three estimates? What's wrong with that?

**MR. SORICH:** First of all, there is no requirement to do a survey under existing law. Companies have a variety of methods they use to determine what rates are fair and proper. We have found in the....getting three estimates was the way