SENATE COMMITTEE ON BANKING, FINANCE & INSURANCE

that business was done in the past. We found that that was not consumer friendly; was inefficient; and was better to allow consumers to work with insurance companies, work with repair shops, and that is what is done in the great majority of cases.

**CHAIR SPEIER:** Well, let me argue differently, Mr. Sorich. I mean, I don't necessarily want to go out and get three estimates to get my car repaired, but I also don't want to pay $1,500 when the place I take my car to, my insurance company says, "Oh, you know what? We're not going to pay that much." I mean, we've got a huge gap between what the consumer expects from their insurance company when they're in an accident in terms of the fact that it's going to be repaired and repaired to a condition that it was before. I don't want to have to have two different colors of paint on my car. I mean, I want to be able to have the tint matched. And to suggest now that that can't be done by some insurers who just arbitrarily now say, "We're not going to do that. We're not going to pay for that."

**MR. SORICH:** Senator, I did not hear any evidence this morning of a great number of consumers who actually were complaining to the Department of Insurance. The department testified that they received a large number of complaints from body shops, but when the department has contacted the consumers who were the subjects of those repairs, the consumers did not go forward. If there was this great dissatisfaction with the way that repairs are done on the part of consumers, wouldn't you think that consumers would be coming to the Department of Insurance? I didn't see any evidence of that. I hear repair shops complaining that they're unhappy with the rates that insurance companies want to pay for repairs.

**CHAIR SPEIER:** Well, I would suggest to you that 600 cases that have been filed, I guess, at one point or another, 250 of them have gone to small claims court from one repair shop owner, and 90 percent, 95 percent of those being settled, or being judged by the small claims court judge on behalf of the consumer, suggest that this is not a small problem. And to diminish it or minimize it, I don't think is in our interest. Because, you and I know what will happen. This is ripe for class action. I can just smell it.

**MR. SORICH:** And, Senator, I would observe that insurance companies know that. And that I would suggest that insurance companies knowing the threat that they face in small claims actions, the threat that they're facing from the Department

Insurance on regulatory activity, the threat that they're facing on bad faith actions, companies are not haphazardly violating the law. So that's the fact.

**CHAIR SPEIER:** Well, okay. I can accept that possibly. But in the end, I think the consumer should be in a position of knowing that by paying that premium, when their car gets into an accident, that it's going to be repaired and then they're not going to have to pick up a dime of it.

Now, if in fact you want to create a Kaiser plan within the insurance industry in which they only can go to direct repair shops and that's all part of the deal up front—where they're going to pay less for their auto insurance, or they know all of these things up front, that's a different thing. But that's not what they're being offered today.

**MR. SORICH:** Senator, I agree. And we heard from a lot of dissatisfied repair shops today. We didn't hear from a lot of dissatisfied consumers.

**CHAIR SPEIER:** Well, 250 of those consumers went to small claims court and got reimbursed. So, they were dissatisfied enough to do that.

**MR. SORICH:** That was the evidence put forward out of the tens of thousands of repairs that are done every year in California.

**CHAIR SPEIER:** I think you make a mistake by diminishing these cases, personally. But, Senator Cox, do you have anything?

**SENATOR COX:** Well, Madam Chair. I'm sitting here thinking about this aspect. It does seem to me, that we already have in this repair business what's a preferred provider organization akin to what happens in the medical insurance marketplace. And so, I think, frankly, the Legislature has some work to do. I do, in fact, believe that we can resolve the issue. It does seem to me that the Bureau of Automotive Repair, they had some, not just with the auto body, but they had some 20,000 complaints last year. Maybe they, in fact, have a different 20,000 complaints. And so it is a situation. It just seems to me that, I think, the Legislature is just may have to rethink this aspect of steering. I don't sit here today saying that we ought to just go out and get three bids. I may be different, though, Madam Chair. I read those policies when I get them.

**CHAIR SPEIER:** And you have a special interest in the area.

**SENATOR COX:** I do. Yes, and I lean towards lots of insurance, there's no question about that. The more, the better. But it does seem to me, that you

recognize that when you go with a particular company that, in fact, they're going to try to make commercial arrangements with some auto body repair shops. And my presumption is, that in some way, that keeps the rates lower than if we just allow the rates, or the charges, to accelerate. But I think this is an issue that we can work through and resolve.

**CHAIR SPEIER:** All right. Let's look forward to doing that.

**MR. SORICH:** Thank you, Senator.

**CHAIR SPEIER:** Thank you. All right, let's move on now to Joel Laucher, and have an update on the 2003 wildfires and subsequent investigations.

Mr. Laucher, do you have any opening comments? I assume the Commissioner has left, is that right? And not coming back, is that right?

**UNIDENTIFIED:** You know, I don't know that, but I think that's probably the case.

**CHAIR SPEIER:** All right.

**MR. LAUCHER:** No comments.

**CHAIR SPEIER:** No comments, okay. It is our understanding, based on press reports, that the Commissioner conducted market conduct exams on six insurers from the 2003 wildfires—is that true?

**MR. LAUCHER:** We have instigated market conduct exams on actually seven carriers. It was initially six. We expanded it by another carrier for underwriting issues, and we did four exams based on claims issues.

**CHAIR SPEIER:** And what are the results?

**MR. LAUCHER:** Well, we have held off the completion of those exams until they are all completed. We have two more exams that we are looking at some files, some, basically, redacted files, that we didn't get access to the first time through. We're looking at those now.

Actually, the claims issues were pretty minimal in what we had identified in the claims side of the exams, and that's one of the reasons we did fewer of those. The main issues were actually in the underwriting and decision-making process regarding the setting of the limits on the homes. And I'd say the main issues that we have found there, is that there is an inconsistent application of replacement cost evaluations and lack of documentation of how the limits were set. Those are kind of the two main issues.

**G&C 00727**

SENATE COMMITTEE ON BANKING, FINANCE & INSURANCE

**CHAIR SPEIER:** Explain that last one.

**MR. LAUCHER:** When you look at the underwriting file, which includes the application, whatever sales information is there, it's very unclear in many of the files, how the actual limit that was chosen for coverage A on the dwelling structure was set. Frequently there isn't an insurance devalue calculation in the file, or there is a negotiation apparently, that took place between the agent or the broker, and the applicant, and it is unclear who selected the limit that was applied and issued.

**MR. BAUM:** This goes to the major concern we had out of those Southern California fires of under insurance and how that...

**CHAIR SPEIER:** Right. In fact, the Commissioner came out with a fair amount of fanfare about the problem of under insurance and actually held some hearings, did he not, on the issue of under insurance?

**MR. BAUM:** I believe so.

**CHAIR SPEIER:** And so it is your belief that there was under insurance issues among the homes in the wildfire areas?

**MR. LAUCHER:** Well, I believe that the exams show that there's inconsistencies in how the actual Coverage A limit is set within a given company, for example, that, in some cases they might use one method to determine the limit, or an alternative method where they might just ask the consumer what they want. So there's an inconsistency in how each particular company sets that limit, and then there's a lack of documentation as to what process happened at all.

**CHAIR SPEIER:** We had a hearing on the issue, and we came away from that hearing with the belief that there wasn't an issue of under insurance, as much as there was a reliance on the software QuickQuote by many agents, that resulted in homes being under insured. But when you actually went through the software and asked all the questions, the properties tended to, in fact, be very close to properly insured to the five or ten percent off.

**MR. BAUM:** And so, the question was the process that either the given agent or the individual engaged in. And I think what we're hearing Joel say is, as we go into the files to determine what documentation there was, at least in a number of cases, we're finding them at best, inadequate, and in some cases, none existent, which is, from our perspective, potentially a real problem.

**CHAIR SPEIER:** So is that for lack of the company having the proper

G&C 00728

software, or the means by which to make the assessment, or the lack of an insurance agent in not following procedures and using the existing software or procedure developed by the....regardless, of course as agent of the insurance company they will be held liable. I just want to get a handle on this issue of...

**MR. BAUM:** The issue of what's in the file starts with the company's protocols, and the enforcement the company follows up in terms of its agents, or adjusters, or whomever, as to what they're requiring; what they require to have in the file and then their enforcement mechanisms if it's not in the file, how they follow up on it. That's the first thing.

As to how each company does establish the rate, that depends upon the system they're following.

**CHAIR SPEIER:** Okay. A very simple question—is there an under insurance problem, or was there just ineffective use of the existing software or protocols?

**MR. LAUCHER:** Well, we heard presentations by a number of the vendors who provide this software to the insurance companies. And one of the things that we found was that all of them can be altered or tailored by the insurance company. And so, just as you said, Senator, if you use it right, you may get one result. But if you take a shortcut, or you don't use it properly, then you may not. And so, the impression that I had was, that to some degree this may be due to a competitive desire to get to a rate and get a response to a consumer quickly who is looking for insurance, as opposed to going through the full process of actually going through the whole thing.

The second thing that we learned was, that companies vary as far as what they do to update in subsequent years. How careful are they to try to find out from consumers if they've done any work on the house; if they've added a deck; those kinds of things? Because if they aren't told about those things, then obviously there's going to be a problem.

**MR. BAUM:** And there's the obvious tension between making sure that everything you have in the house is covered and that you have the appropriate sizing of the cost of rebuilding, and your insurance premium, which to the extent that you come back to the carrier and say I want these things covered and so forth, it generally will translate into a higher premium. That creates a tension both between the agent, and the homeowner. That's why we're focused right now, in particularly,

on the documentation of the conversations and of the interaction, which right now we're finding at least in a number of files aren't there.

But I think that Gary's description of what we've found with respect to the systems used, is quite accurate. That most of the systems of all of the information was put in that they'd call for would give a relatively accurate result. It's the process of making sure that the information that needs to be in there, gets in.

CHAIR SPEIER: So none of the insurers, there's been no completion of....there's been completions of the market conduct exams, but you have not specifically negotiated the settlement with any of the insurers?

MR. LAUCHER: That's correct.

CHAIR SPEIER: With the exception of Allstate.

MR. LAUCHER: Right. With Allstate, we did include the claims issues we had identified in the settlement that we reached with Allstate. It didn't really include the underwriting issues.

CHAIR SPEIER: So does that mean that they're still subject to review for the underwriting issues?

MR. LAUCHER: Yes.

CHAIR SPEIER: And based on my understanding of that settlement, there was no penalty for any issues relative to the 2003 fires. They just made a commitment that they would pay properly the claims...

MR. LAUCHER: Well, the negotiated figure, because that was a settlement, included the claims issues. So there wasn't a specific amount that went to any one issue, but the settlement included the realm of issues identified in the settlement agreement, which included the wildfire claims issues.

CHAIR SPEIER: In a case, if you were to find that a particular insurer did not properly use either their protocol or software and had inadequate insurance offered to their insureds, would you go back then and require them to pay the amount to replace the home?

MR. LAUCHER: Well, you know, we haven't gotten to the resolution process yet with these. And there are several issues that come into play in terms of whether the consumer wanted the particular limit that was selected. You know, how that negotiation went.

CHAIR SPEIER: My experience has been in my homeowners insurance, that

SENATE COMMITTEE ON BANKING, FINANCE & INSURANCE

you pay the premium. They come out. They figure how much it's going to cost to replace the house. You don't argue with them. And you pay the premiums. So, presuming most people are like me, as a consumer, then the question....I guess what I'm trying to get at, from the department, what's the expectation of the consumer?

**MR. BAUM:** You want to know what our remedies are....

**CHAIR SPEIER:** Are the remedies just going to be a fine on the insurance company and the consumer is never made whole?

**MR. LAUCHER:** Well, the first thing to note, is that in many cases in the wildfire situations, the company did do some level of investigation themselves to determine, to the degree they could, lacking documentation in the files, how that limit was derived and try to determine if the agent or the company had any liability in determining how the limit was set. If they were the root cause for setting a limit that was not sufficient to pay the claim, there were many contracts that were revised and settlements above the maximum limits available, even with the extended replacement costs. So the companies did do some level of that.

You know, I would tend to agree with you that we would look for a resolution that would make the consumers whole in any case where the company had a role in leading to the under insurance, although we don't have that kind of authority to mend it. That would be what we would look for on their behalf.

**MR. BAUM:** Not dissimilar to the Oakland Hills situation, where we didn't have the authority necessarily, to require reformation of the contracts, the Commissioner made it sufficiently clear that there was considerable reformation that went on.

**CHAIR SPEIER:** After the Oakland fires, it's my understanding that the Insurance Department went back and audited to determine whether or not subsequently there was adequate insurance held by homeowners in that region. Is that correct?

**MR. BAUM:** I'm unfamiliar with the audit because it occurred....because we were out of office.

**CHAIR SPEIER:** Mr. Laucher, do you remember?

**MR. LAUCHER:** Well, the department did do a study on this issue in late 1999. Actually, we had done a previous one. I don't actually recall the date. But

we did one in 1999, and it showed, actually, inconsistencies in the limits ranging among the carriers that we surveyed at the time. And there were some recommendations for some changes in those practices, but the department had, at that time, intended to have some kind of hearing, but the then commissioner didn't really make it a priority. When the new commissioner came in, Commissioner Garamendi, the issues really were different in our homeowners market. It had to do more with companies withdrawing from the market, or looking to get off the book of business using numbers of claims, or that type of thing to get off of risks, and that is what this commissioner did made a priority, and he did attempt to get some legislation there. So issues had kind of changed, but we had certainly looked at that problem and saw that there was a real problem there.

CHAIR SPEIER: Okay. When do you think your market conduct exams will be completed and that you'll make...

MR. LAUCHER: I would hope that they will be completed sometime by January.

CHAIR SPEIER: And then you will make an announcement about all of them at the same time? Is that your intention now?

MR. LAUCHER: Well, the exams, for the most part the information that they include is confidential information. So the only information that would be made public is if we were to take some enforcement actions. So I'm assuming that that is a possibility.

CHAIR SPEIER: And so if and when you do that, that would be in January?

MR. LAUCHER: Yes.

CHAIR SPEIER: All right. Does the department believe that as part of its oversight authority, that they have a responsibility to determine if there is over insurance or under insurance?

MR. LAUCHER: Yes, we do.

CHAIR SPEIER: All right. So, looking prospectively, under insurance should not be a problem if, in fact, you audit on a regular basis?

MR. LAUCHER: Well, what the department looks for is that companies have a protocol for making sure the consumer is insured to value and how that is communicated to the consumer. I think the companies would say that just because they set what is there insurance to value, just means that you qualify, perhaps, to

G&C 00732

buy their product, but isn't a guarantee that that's the limit that will be rebuild your home. What the department looks at, is that whatever process the companies adopt, that they apply it consistently, and that they fully disclose to the consumer what the process is, and what it means to them. And we look....if they have a limit....the limit that is on the policy, we expect some documentation to show how that was chosen. If it's above what the company has in their records as the insurance to value calculation, we would expect some documentation to say, how was that higher limit chosen? Or if there were a lower limit, we would expect them to have some documentation to say, how did you arrive at this limit that's lower than your insurance to value calculation? So we look for whatever they do to be fully documented.

**CHAIR SPEIER:** All right. So, I mean, based on what you're saying, we should not have an under insurance issue in California, or an over insurance issue in California, if everyone plays by the rules, in terms of the rules they set forward; the protocols they create, the software they follow?

**MR. BAUM:** That is exactly the right conclusion. We should not, if they are, in fact, playing by the rules, appropriate protocols; that the consumer knows that they ultimately will be setting the rate, choosing that rate; and that the insurance company knows that when they are giving an identifying size of coverage, that if the consumer says yes, or the consumer says I want more, or the consumer says I want less, that that should be documented in the file so that we don't have these finger pointings that occur inevitably. So you're absolutely right. And we believe they should have protocols, and we would ding them if they don't have appropriate protocols.

**CHAIR SPEIER:** All right. Senator Cox.

**SENATOR COX:** Well, let me just....I don't believe that having protocols eliminates either the under insured or the over insured. I think what the protocols mean, and that is, my guess is, that the insurance company doesn't agree to, in fact, do a significant amount of over insurance just from the standpoint of filing a claim. But it does seem to me, that if the customer, and that's the one group that's left out here, if the customer says no, the insurance company then, or the agent, has two choices. One of which is, they can document it, or they can say, thank you very much and go someplace else. And so, just because we have protocols relative to

over and under insurance, I don't believe solves that problem. I do think the important consideration, however, is that there must be documentation relative to how a protocol was used. Informed consent, if you will, so that at some point in time, the agent or broker or company, is not faced with the fact that the insured is attempting to get a greater value than they thought they originally had. So, that's accurate—correct?

**MR. BAUM:** I agree with that.

**CHAIR SPEIER:** Anything else? All right. I think that takes care of the wildfires. I think there was an issue on Unum-Provident, and a speaker that wanted to testify as well, is that right? All right.

**JOHN METZ:** Thank you, Senator. My name is John Metz. I've been a consumer advocate for 20 plus years. I believe several of the insurance commissioners have issued findings recognizing the fact that I've acted in this capacity for a long time. The current insurance commissioner requested, I think, in 1991, that I participate on the taskforce that drafted the unfair, currently fair, claims practices regulations, and I've been involved with that ever since then, as well as many other issues before the Department of Insurance. I am also chairman of the California Consumer Health Care Council, which is a 501(c)(3).

**CHAIR SPEIER:** Okay. And your point today is?

**MR. METZ:** My point today is, that I've actually, and the council has been interested, in this Unum issue since late nineties and we brought the issue to the Department of Insurance back then because it was apparent to us, based on the fact that people were coming to us with complaints, that it appeared that Unum was violating the law.

Now, I want to say that the fact that this commissioner did not go along with the 48 multi-state settlement agreement with Unum is something to his credit. I think that the settlement that he obtained is better than the multi-settlement agreement, but it leaves a lot to be desired.

And the fundamental problem with it is, that, let's see, the day that he issued his statement, Unum also issued statements. Even though the department found in excess of 25 separate practices affecting tens of thousands of claimants, sick and disabled claimants, as well as other policyholders who have not the claims yet, potential policyholders, competitors in the market, they found 25 or more separate

practices affecting all these people. Unum issued a statement saying that basically, "Well, we settled this thing because we didn't want to spend out time on it. Maybe there were a few problems and let's go on about our business."

Recently, on October 27th, Unum issued a rather rosy picture about the growth that it sees for itself.

When the Commissioner issued a notification of the California Settlement Agreement, he's quoted in the *LA Times* as saying, "Unum is an outlaw company. It is a company that for years has operated in an illegal fashion." And the settlement agreement compels it to reevaluate 26,000 claims, approximately.

**CHAIR SPEIER:** So your point is?

**MR. METZ:** My point is, that they committed fraud. They violated existing laws. Insurance fraud in California is defined amongst other things, to prepare or make any written or oral statement that is intended to be presented to any insurance claimant in connection with or opposition to, any claim or payment or other benefit knowing that the statement contains any false or misleading information concerning any material fact, or to conceal the occurrence of any event that effects the right or entitlement of any person to benefit or payment.

**CHAIR SPEIER:** So, there was a Department of Insurance press release that went out October 3rd. It's in the backgrounder. And one of the bullets is that Unum Provident knowingly applied the wrong definition of "total disability" in claims handling. So, if I understand you correctly, that statement by the department underscores a standard for criminal fraud. Is that your point?

**MR. METZ:** That is the point with regard to that statement. There are also 25 or more others that the department identified. Each and every one of the practices clearly involves making false or misleading statements about facts that are material to the claims.

**CHAIR SPEIER:** Okay. So the department had the benefit of the May hearing and then responded to us saying "That while the department does have the authority to file criminal fraud charges against insurers, it is more theoretical in nature"—correct?

**MR. COHEN:** We don't have authority to file criminal charges, Senator, that we have authority to refer to district attorneys or attorneys general.

**CHAIR SPEIER:** Right. Absolutely. I misspoke.    **G&C 00735**

**MR. COHEN:** They make the decision whether to file.

**CHAIR SPEIER:** So, the question is, have you ever referred to the attorney general, any action by an insurer as being consistent with criminal fraud?

**MR. COHEN:** We actually referred the Unum case to district attorneys twice, and the decision was made to decline to bring criminal charges.

**CHAIR SPEIER:** Okay. But you actually have done that.

~~**MR. COHEN:** Yes.~~

**CHAIR SPEIER:** I did not know that. All right.

**MR. METZ:** I wasn't told that either, although I've asked about it.

**SENATOR COX:** So you couldn't get the district attorney to take the case.

**MR. COHEN:** Correct. Two different district attorneys.

**SENATOR COX:** And the district attorney didn't take the case because what? They thought the monetary fine being imposed by the Department of Insurance was adequate?

**MR. COHEN:** Well, I can't speak for the district attorney in terms of why they didn't take the case. I can speculate that the reason is both because these cases are complex and difficult, and because as you suggested, Senator, there is an adequate and in some ways, I would argue, superior, remedy available to the department as compared to a criminal prosecution.

**CHAIR SPEIER:** So you think fining is preferable to...

**MR. COHEN:** Well, no. We received an extraordinary....we obtained an extraordinary result in the Unum case. And we didn't just fine Unum. I mean, Unum has agreed to revisit all claims that were terminated or denied from 1997 to date. Unum has agreed to change its claims practices and agreed to an injunction.

**CHAIR SPEIER:** So do you then hire a monitor to make sure that this company does all those things?

**MR. COHEN:** Well, we're going to continue to oversee Unum through market conduct exams, and they know that we're going to be using that method. In addition, in terms of the claims review, Unum has agreed to the appointment of an independent person to manage the independent claims evaluation that's going to be happening. And that's actually going to be someone who is a former employee of the department.

**CHAIR SPEIER:** Okay. I'm glad to hear that because I think the presumption

G&C 00736

that somehow, just because you've taken action and you find someone, you then tell them to go back and relook at these claims, that somehow that's just going to happen on the natural, when their conduct, historically, would suggest that they're not the best actors.

**MR. BAUM:** We agree, Senator. And a key difference between the multi-state settlement and the California settlement was specifically on that issue. California would not settle with the company unless there was an opportunity for a third party independent review and appeal procedure. That does not exist in the multi-state.

**CHAIR SPEIER:** So, we really have an interesting question to ask ourselves. We file actions criminally against chiropractors who bill for doing work on an individual when they're doing it on a dog, as you put out in a press release not so long ago, and it's referenced in the backgrounder, and for others. But we don't file criminal charges, for the most part, against companies. So the question is, this statute is on the books—should it stay there; or should we get rid of it?

**MR. COHEN:** I think that it is a fair question to ask, and since the question has come up through Mr. Metz' efforts and also from the committee, I have directed that we develop a protocol within the department to make sure that in any case of significant fraud alleged against an insurance company, that we will take it up the chain of command and make sure that criminal referral is considered as one of the remedies that we look at. So I want to make sure that we're not just kind of avoiding it by not at least considering it.

I guess the response, though, that I still feel that it would have to be an extraordinary case, and the Unum case was an extraordinary case, and did justify making a referral. The reason I say it would have to be an extraordinary case is, because we already have the ability at an administrative hearing with the burden of proof of preponderance of evidence, the authority to revoke a license of an insurance company. That's the death penalty. I mean, so we already have extremely strong authority....

**CHAIR SPEIER:** But, they can reorganize under another name.

**MR. COHEN:** So, I mean, I agree that we should look at criminal prosecution in the appropriate case, but I also think we need to weigh the jury trial, proof beyond a reasonable doubt, etc.

**CHAIR SPEIER:** All right. Okay. Anything else, Mr. Metz?

G&C 00737

**MR. METZ:** Yeah. I did a little review of the enforcement actions the department posted on the website for 2004. And virtually, all of them, of course, were for fraud committed against insurers. And I think it's absolutely appropriate that people who commit fraud against insurers are prosecuted. In those cases, and if you read them, you'll see that the department devotes a lot of time and energy to it, they considered it important enough to devote their time and energy in order to get, for example, based upon a $30,000 fraud, they were seeking eight years in prison and $150,000 in fines. The list goes on and on and on. It's all relatively small stuff compared to the size of the frauds that we're talking about here. And I don't disagree with Gary about the notion that the department should use all of the mechanisms it has. It is not a matter of either or, it's simply a matter that right now, because insurers know for certainty....not only insurers, but those who work with them in these acts. And it's not all insurers. It's just those that violate the law. They know they're not going to get tagged. They're not going to do any time.

So, you have a statute that's enforced in an uneven way, where it makes it very clear to the bigger players in the field, that crime pays. It pays bigger time than all of the fraud actions ever brought by the Department of Insurance put together against the ones who are cheating insurance companies. And I encourage them to continue doing it.

So, unless something changes, I mean, the penalties that we see are no more than blips on the bottom line. They're important blips. I think it's much better than doing nothing.

But I agree with you, either enforce the law, or take it off the books.

**SENATOR COX:** What happens if the district attorney won't take the case?

**MR. METZ:** Well, I think that the biggest problem is that it's a question of mindset. There's something that's been going on as long as we've all been alive, where nobody ever prosecutes this stuff. And so district attorneys faced with the possibility of prosecuting insurers, face a daunting shift of mindset.

I know of only two cases, I believe the Fresno DA brought cases on the 549 and 550 against employees of an insurance company. There's a tremendous amount of pressure not to do this. I mean, we all know that the insurance industry employs one-third of all non-governmental lawyers in the United States. They have vast....

**G&C 00738**

**CHAIR SPEIER:** I didn't know that.

**MR. METZ:** Well, I'll get you the book where I got it from. The last time I looked...

**SENATOR COX:** Well, let me just tell you what my experience with respect to district attorneys. They have a mind of their own, and if they think they have the ability to prosecute somebody who is doing wrong, they do that.

**CHAIR SPEIER:** Well, in truth, the resources for the DA are limited, and they will weigh what kind of a time suck a case like this will be, and oftentimes has. Now, the attorney general has more resources; probably it should be the first stop whenever you've done these reviews, because their resources are just so much more extensive.

All right, we're going to have to conclude this section. Anything else you'd like to say?

**MR. METZ:** I'd just like to point out that the idea that insurers are violating the law and committing fraud is not coming from me. The Commissioner made this public statement, quoted in the *LA Times, that in the last 12 months alone, we've seen the largest insurance brokers in America, the largest property and casualty companies in America, the largest title insurance companies in America, the largest financial services of firms in America, and the largest disability insurers, all engaged in flagrant violations of their most basic obligations to their customers.* That came shortly after Elliott Spitzer, the attorney general of New York, says, *Fraud in insurance is vast.* He said, in doing his investigations regarding the broker fee kickbacks, that he was amazed at the extent of the violations that he found.

**CHAIR SPEIER:** All right. You've made your point. Thank you.

**MR. METZ:** Thank you.

**CHAIR SPEIER:** All right. I have one last issue. I think it falls into this section. There was an article recently in the *LA Times* written by Jamie Cort. I'm sure you've seen it. It talks about the zip code issue, and kind of goes through a litany of comments made by the Commissioner about how he's going to address this issue. Starting back in 1991, and then when he left office in 1994, saying he ran out of time and that Commissioner Quckenbush should take it up.

In 2003, he once again said that it has to be addressed. In January of 2004, he said, *Let there be no doubt about it, there has been sufficient information to*

*convince me that the current regulations are unjust, unfair, and must change. That will happen. The schedule is such that by mid-summer 2004, there will be new regulations.*

In May of this year, *I intend to change the zip code rating program in California before I leave office.*

Where are we on zip codes?

**MR. BAUM:** Senator, I believe actually this issue came up at the earlier hearing. You asked exactly that same question.

**CHAIR SPEIER:** Oh did I really?

**MR. BAUM:** It's okay. It's all right. And the answer...

**CHAIR SPEIER:** Maybe this article hadn't been written then.

**MR. BAUM:** It's not a problem. As a matter of fact, Jamie Cort, I think you asked it because Jamie Cort was one of the witnesses at that...

**UNIDENTIFIED:** It was Doug Heller.

**MR. BAUM:** I'm sorry. It was Doug Heller who was the witness. The answer is the same—the Commissioner is on a schedule. We will have it done by the end of his term. In fact, we are on a fairly expedited schedule, and we hope to conclude our process hopefully by the end of this year, if we can stay on schedule.

The primary task we are doing right now is examining, as you may recall, there are a number of petitions in front of us related to this issue that make proposals as to how we should resolve the issue. The Commissioner expressed considerable concern over the fact, and has targeted resolving the fact that people who are on one street next to the other have significantly different rates. That's what we're looking at. We're looking at the system, and we are trying to run it through the data to find out which proposal that we are looking at might resolve it, and what the effects of it are. Because, unfortunately when you lower somebody's rate, you end up potentially raising somebody else's rate. So that's part of the examination we're doing—as to how to do this in a fair and equitable methodology for all of California.

**CHAIR SPEIER:** All right. But in fairness, if you're raising someone's rates that's been artificially low, you're equalizing it.

**MR. BAUM:** Absolutely.

**CHAIR SPEIER:** So, let's be clear about that. Okay. Very good. Let's move on then to the Enforcement Branch. Mr. Banda.     **G&C 00740**

SENATE COMMITTEE ON BANKING, FINANCE & INSURANCE          Page 86 of 111

**DALE BANDA:** Good afternoon, Senator. I am Dale Banda. I'm deputy commissioner in charge of the Enforcement Branch. It has two divisions underneath the branch. One is, the Fraud Division, and the second is the Investigation Division.

**CHAIR SPEIER:** All right. Do you have any opening comments you want to make?

**MR. BANDA:** No, I don't.

**CHAIR SPEIER:** You don't. Okay. We'll go right to the...

**MR. BANDA:** I'll take any questions from the committee.

**CHAIR SPEIER:** Okay. Now there was an audit done by the state auditor on the workers' comp issues within the department that was fairly critical. The question I have is, and it now appears that you're doing a million dollar study—is that correct?

**MR. BANDA:** Correct.

**CHAIR SPEIER:** And when is that going to be completed?

**MR. BANDA:** The proposal was given to the Workers' Comp Fraud Assessment Commission, and at that point, they voted to assess an additional million dollars to the department or to the actual account, and that was proposed to the Department of Finance in the form....it was supposed to be a BCP. I just recently heard last week, that that expenditure authority has been approved, hence we anticipate the study occurring in next fiscal year '06/'07.

**CHAIR SPEIER:** And your BCP was for how many positions?

**MR. BANDA:** No, it wasn't for a position. It was for the study.

**CHAIR SPEIER:** Just for the study. Okay.

**MR. BANDA:** Correct. One million dollars.

**CHAIR SPEIER:** Now, the auditor said that there was a lack of a realistic measurement of fraud in the system. There's no way to determine whether the amount charged employers is worth it. The problem with the DA's getting funded. The method of prioritizing suspected fraudulent claims so that those of less importance were not referred for investigation would have moved the DOI Fraud Division....All right. So, I guess I'm looking at a more global question. If we don't have a handle on fraud in the workers' comp system, we're charging employers x-number of dollars for it; who's to say we have a handle on the fraud in auto,

homeowners, and other insurance? And, if we don't have a handle, then how are going to get a handle?

**MR. BANDA:** The Fraud Division receives approximately....well, last year, in '04/'05, we received approximately 25,000 referrals. We average about 2,000 referrals on all programs statewide. And part of the referral process is to determine what has been reported to us _____ actually been paid in the claim, what the potential fraud would be, should the claim continue on, or the activity, or third, if there was suspected fraud, because there are different components.

In '04/'05, we had a reported potential fraud and actual fraud of about $900 million—less than a billion dollars. And so we do have a form of measuring what's reported to us. It doesn't necessarily mean that all of it is being reported, but we do have some framework to work with.

And with that, we look at, if we look at return on investment, we did some calculations in that the expenditure, the actual expenditures of the district attorney and the Fraud Division compared to the chargeable fraud; what we did in cases that were actually charged, the amount, comes out to about a three to one ratio for every one dollar the program is given. We get three dollars out of that particular....out of the program.

**CHAIR SPEIER:** Well, now that is disputed by an internal DOI study that suggests that, in fact, return on investment in this case, and I'll quote, "The memo talks of special note utilizing the average dollar amount per investigative hour, figure of $1,297 for direct hours recorded. Fraud Division expended $191,000 in funding to arrest and prosecute approximately $11,000 in actual fraudulent loss to an insurance carrier. Suffice it to say, that return on investment concerning this case was five-tenths of a dollar in identical actual fraud prosecuted for one dollar in investigative funding expended."

Now, this individual—and this was his internal DOI document that I'm sure you're familiar with—suggests that the fraud we are investigating, we are not doing in a very smart fashion, and that we're not going after the big problem areas, necessarily.

And you know, I understand how that can happen from time to time, because sometimes it's easier to go after the fraud that is more tangible and may, in fact, be smaller in nature. But, we're not the only state that incurs this kind of fraud, and

other states probably are doing equal to or better at this, and how can we improve, is what I guess my question is?

**MR. BANDA:** That's a lot of questions, and I'm going to start with the last one first. And that we do compare as best we can to other states fraud efforts.

In case in point, in 2003, according to the Coalition Against Insurance Fraud, the Department of Insurance in California set a national record for 1,118 convictions. The next state, or actually the three states, I believe was, Florida, New York, and New Jersey combined, or a little bit more than that was the actual amount of convictions. So we try to compare ourselves with other states as best we can. Some of the laws are different, so sometimes you get into I'm comparing apples with oranges.

As far as referencing the internal memo, that memo was actually requested by myself, to look at a workload analysis to determine where we would put investigators in on existing vacancies. The actual memo itself never came to my review, or even a first line supervisor to review it. There were a lot of flaws in the memo, including the analyst not realizing there was a bug in the database, where we actually had cases that were newly assigned that were not documented properly, addition to the number of SFCs (suspected fraudulent claims), the analyst went to our mail intake unit, rather than using data directly from our database, which skewed the figures even more.

The case you're talking about was actually a Fresno case, where the amount of hours....actually, the case since then has been adjudicated successfully with conviction. I think approximately, it was about 176 hours involved—investigative hours involved.

With our methodology, the way that we were looking at the corrected methodology, would be around $50 to $60 an hour if you used the whole region's office budget.

If you look at it from even more extending even more, the Department of Insurance does an annual assessment of the annual rate of an investigator, which is about $97 an hour, which comes to around $17,000, I believe. I don't have the figures in front of me. So I believe there was an actual return of investment in that particular case.

**CHAIR SPEIER:** All right. Mr. Perkins has a question for you.

G&C 00743

**BRIAN PERKINS:** Madam Chair and Senator Cox, I've looked over both memos—the one that was prepared earlier, and the one that we've received in preparation for this hearing most recently from the Department of Insurance. And they're difficult to reconcile, because at least so far as I can tell, they take two different approaches and actually seek to answer, to some extent, two different sets of answers.

The second one, the one that I received most recently and that's still being reviewed, I think because it has small math error ____. That one sought to determine how many direct hours were spent by investigators on investigations, and came to a percentage rate of 70 percent.

The earlier one was a much more nuanced analysis, and I can't tell yet whether or not there is methodological flaws, or whether it's simply a different way of looking at the problem. And the nuance was, that they wanted to figure out the bang for the buck. And while bang for the buck could be 70 percent or 80 percent direct hours, could be a proxy for the comment about, or the statement about bang for the buck. This earlier memo, at least in my judgment is not per se flawed. If there was a flaw in the way in which it was developed, I still think that the questions that its trying to get at are significantly different than the ones that were presented most recently. I'm hoping that I will be able to follow up a little bit later in trying to figure this out, because I'm personally a little bit troubled by some of the numbers.

**CHAIR SPEIER:** I mean, the numbers are very different—44 percent, was the three year average.

**MR. PERKINS:** And in fact, at least in that respect, that goes to the methodological issue. The individual who is doing the analysis basically took the perspective, that if an investigator were on the beat looking for the bad guys, that was direct time. Other time was not. And so, the example that was given was, perhaps if someone went to a school and spoke about fraud, that that was billed to the program, the auto fraud program, as direct time. But at least from the analysts' perspective, that's not what the public would expect to call direct time, because it doesn't look out for bad guys. So, that's just one characteristic, one distinction, between the two different perspectives. That still gives me a little bit of concern, because I don't think the analyst was necessarily off base in trying to approach it _____. They may not have understood the assignment, but they certainly

**G&C 00744**

came up with some provocative conclusions.

**CHAIR SPEIER:** So, I guess maybe the short hand version is, if there is any validity to this original memo....let's put aside disputes about the flaws and the like....what steps are you taking, or will you take, to maximize the bang for the buck?

**MR. BANDA:** The first thing on the insurance carriers side, we get a lot of referrals that come in that really have no merit. They just come in and they don't meet or rise to the level of where they can open an investigation. So what we have done is just recently we've promulgated a new array of SI use, (special investigation regulations) that clearly define definitions when to refer, and increase training, and provide more clarity to how we want to get quality cases being referred. So that's from a regulatory standpoint from the industry coming in.

Second, what we've done is, we've enhanced the database. There was coding errors when we developed the database. The database was actually developed in 2001. It's an all inclusive database which tracks the number of referrals and all employees times and then is broken down by time sheet categories. And so, the point of when we developed the database, and I was actually involved in it, was to look at efficiency and determine where to direct our resources adequately. Since then, we've also provided additional guidance and training to the supervisors to be more efficient when we open up cases so that when we actually do a case, that we can get a successful prosecution as a result of it. So we've done some steps, in my opinion, that is corrected. And hopefully, I believe, in showing the numbers as they go through the years are starting to become more and more on the positive nature in how much we're actually investigating.

**CHAIR SPEIER:** All right. I have one last question. We got a phone call through the committee from a DOI employee (this is referenced in the backgrounder), speaking about some of the personnel problems in the Fraud Division, and in particular about multiple accidental discharges of weapons in several DOI Fraud Division offices, including one in which an employee lost a portion of a finger. You reported back to the committee that the accidental discharge of the weapon was due to a violation of department policies and that investigator is no longer with DOI. What does that mean? Was that person transferred somewhere else? Was that person fired?          **G&C 00745**

**MR. BANDA:** There were two incidences that you are referring to. The first one, was an investigator that was cleaning his gun in an office which was....in each office there is a clearing barrel. If you're going to actually do anything with your weapon, you're supposed to put it in the clearing barrel so that there is no accidents. In any event, there was an unintentional discharge. There's no, in my opinion, accidental. The gun doesn't accidentally go off. Somebody unintentionally discharged it. In this case, it was discharged into a table. As a result of that, when we initiated an internal affairs investigation, prior to the internal investigation being completed, which was later determined that the investigator was in violation of policy, that investigator, on his own, left state service prior to the conclusion of the investigation.

The second incident was range incident where, once again, there was another investigation where the investigator violated policy, this was the finger, it was in a range facility, not in the office. And ultimately, that was investigated and determined that to be a violation of policy. Prior to that investigation being concluded, that investigator, as well, left state service.

**CHAIR SPEIER:** Do our investigators need guns?

**MR. BANDA:** I believe that they do because we do a lot of arrests that involve not only insurance fraud, but other crimes that occur. And we've had situations, we've had organized gangs involved in insurance fraud, we've had staged auto accidents, where we've actually went out and seized drugs and narcotics and cash. So, I think most of our....in some cases, a lot of our suspects have prior criminal records. We've worked with the CHP, the Department of Justice, in coordinating this.

**CHAIR SPEIER:** But isn't most of your fraud being generated by agents? I mean, isn't that where....where is most of your fraud coming from? I mean, all the press releases we get are all about agents.

**MR. BAUM:** We have two divisions. The Investigations Division deals with the agents, and they do not carry guns.

**CHAIR SPEIER:** Okay.

**MR. BANDA:** Correct. The Investigation Division does not carry guns; the Fraud Division does.

**CHAIR SPEIER:** Okay. So, give us some recent examples of how the guns

G&C 00746

were appropriate.

**MR. BANDA:**  We do a lot of undercover operations.  We've done some involving the staged auto accident rings, where they go out and they prey on the unknowing public as to setting them up for an accident.  Those particular gangs have had history of criminal activity that we worked with in conjunction with the Highway Patrol, as well as with the Department of Justice and the FBI.

**CHAIR SPEIER:**  But you don't go out there alone, you enlist the assistance of the CHP or...

**MR. BANDA:**  We go out alone.  We do our own surveillance.  And if it's the taskforces....on the staged auto accident rings we do a taskforce.  We work with the district attorneys and CHP.

**CHAIR SPEIER:**  All right.  So, safety retirement for both investigators and Fraud Division.

**MR. BANDA:**  There's actually the safety retirement....for the Investigation Division has a little different safety retirement than the Fraud Division investigators.  But there is safety retirement.

**CHAIR SPEIER:**  For both.

**MR. BANDA:**  Correct.

**CHAIR SPEIER:**  Okay.  Senator Cox.

**SENATOR COX:**  Those who are carrying weapons, are they ____ certified?

**MR. BANDA:**  Yes.

**SENATOR COX:**  And the loss of a finger, was that a workers' compensation claim?

**MR. BANDA:**  Yes.

**SENATOR COX:**  It was.

**MR. BANDA**  Yes.

**SENATOR COX:**  And a disability claim, as well?

**MR. BANDA:**  Well, that's pending, but it's likely.

**CHAIR SPEIER:**  All right.  Let's move onto Investigations, unless you have anything else, Senator.

**SENATOR COX:**  Well, I have some questions about....I raised the issue regarding attorneys.  Is it the appropriate time to talk about that now?

**CHAIR SPEIER:**  I'm certain it would be.                    G&C 00747

**SENATOR COX:** Well, let me just ask the questions, then, relative to the number of....it appears to me that the department has approximately 80 attorneys—is that correct, Mr. Cohen?

**MR. COHEN:** I think if we had our full compliment we would. I'm not sure we're quite up to that, but that's close.

**SENATOR COX:** As I looked at that, those 80 attorneys, I'm also concerned about the significant amount of legal work that's contracted out to using outside counsel. So, can you give us some information relative to the number of contracts the department has with outside counsel?

**MR. COHEN:** Right now, we have one with the firm that has been representing us in connection with the holocaust statute—the one that went up to the Supreme Court and now the case is still active because the insurers are seeking to recover attorney's fees from the department. So, the outside firm is continuing to handle that case.

We have one with a firm that is helping us with our investigation into the title industry and the development of....we're in the process of doing a competition study as a prerequisite for holding rate hearings and title.

And we have one with the firm, it's a contingent fee agreement, but with the firm that has been doing the Executive Life case.

Those are the only significant ones, I think. And then the Conservation Liquidation Office frequently hires outside counsel.

**SENATOR COX:** Can you give me four names of the firms that....

**MR. COHEN:** Alschuler Grossman does the holocaust case; Strumwasser & Woocher is doing the title case; and Thelen Reid & Priest is doing the Executive Life case.

**SENATOR COX:** That's three. You gave us four names. You gave us the number of four.

**CHAIR SPEIER:** Executive Life.

**MR. COHEN:** No. Those are the three. The rest of them are all with the Conservation Liquidation Office, I believe.

**SENATOR COX:** The cost to the department setting aside the ones not continuancy, do you have that in your....

**MR. COHEN:** I really don't, but I can easily get that for you.

**SENATOR COX:**  Could you provide us with that information?

**MR. COHEN:**  Absolutely.

**SENATOR COX:**  How were the firms selected, by the way?

**MR. COHEN:**  Thelen Reid & Priest had been retained prior to my coming to the department.  They've been representing the department.  And so was Alshuler, actually.  Both of those two firms had been retained by previous commissioners.  And, Strumwasser & Woocher, we hired.

**SENATOR COX:**  Okay.

**CHAIR SPEIER:**  Was that a sole source?

**MR. COHEN:**  Yes.

**CHAIR SPEIER:**  So you don't go out to bid?

**MR. COHEN:**  No.

**CHAIR SPEIER:**  And why is that?

**MR. COHEN:**  Well, under the state _____ rules, attorneys are not subject to the requirement to go out for bid.  And generally, what I do, is I interview....

**CHAIR SPEIER:**  But there is no prohibition to going out.

**MR. COHEN:**  No, there isn't.

**CHAIR SPEIER:**  I mean, I would think there would be any number of law firms that would love to have....what's the hourly rate that you're paying?

**MR. COHEN:**  We generally negotiate a rate that is a discount off of the firms prevailing rate.  The discounts vary between 10 and 20 percent.

**SENATOR COX:**  As opposed to the posted rate.

**MR. COHEN:**  Exactly.  Exactly.

**CHAIR SPEIER:**  Well, I saw one contract that appeared to be a $450 an hour rate—is that a discounted rate?  I think it's for the holocaust contract.

**MR. COHEN:**  I would have to look at that.  I don't know the answer to that off the top of my head.

**CHAIR SPEIER:**  Well, if it was discounted...

**MR. BAUM:**  I think Mr. Cohen indicated that that retention occurred before we came into office.  So, whatever the agreement was prior to our coming into office, is what we're living by.

**MR. COHEN:**  It could be.  I mean, there are plenty of lawyers out there who

are charging $500, $600 an hour and more.

**CHAIR SPEIER:** So, $450 could be a discount, is that what you're saying?

**MR. COHEN:** Four fifty could be, but I will check. I honestly don't know.

**CHAIR SPEIER:** All right.

**SENATOR COX:** Let me just continue, if I may, with Mr. Cohen, Madam Chair. And I know you want to get out of here, so I will, in fact, be brief. I hope Mr. Cohen's answers will be sufficient so that it's not necessary for us to have another hearing regarding this issue.

You, of course, Madam Chair and members of the insurance commissioner's office know that my opposition to the phishing expedition letter that was sent out earlier this year under Mr. Cohen's signature. And it was certainly, you know, we all want to go after the bad actors. I don't want to have any misunderstanding about that. I am concerned about the fact that it appears that rather than looking for a needle, you've built the haystack.

So, my first question to Mr. Cohen is, what did you find or learn from the information that was collected?

**MR. COHEN:** Primarily what we found was, a) contingent commissions were essentially universal throughout the industry. All agents and brokers were using contingent commissions of one kind or another. And, b) nondisclosure of those commissions was also universal throughout the industry. They were not being disclosed to consumers or...

**SENATOR COX:** So what actions will you take to do the findings?

**MR. COHEN:** Well, two. Well, three. We proposed legislation, which did not survive this committee; we promulgated regulations and had a number of workshops and hearings with respect to the regulations. The industry opposed the regulations very strongly. And then, we tried another tactic, which was to work with the two major agent broker trade associations to see whether we could come up with a voluntary plan or code of conduct that they would adopt that would lead to disclosure of commissions. And the IBAS has come out with such a....it's a guideline, is what they call it, for its members. And at that point, we said that we were going to step back from our regulatory effort; see what happens; see whether that code of conduct is adopted broadly within the industry; and if it has the kind of effect that we want, and if so, regulations may not be needed. The third thing that

**G&C 00750**

we are doing is, we have brought one case, and we are continuing to pursue other cases for enforcement actions against companies that not only charge contingent commissions and fail to disclose them, but also steered the customers in one way or another based on the commission that the agency or brokerage would receive. And some of that information that we're pursuing in those investigations, came from the letter to which you referred.

**SENATOR COX:** Where are all the materials located today that you collected...

**MR. COHEN:** They're at the department.

**SENATOR COX:** At the department. Are the accessible to the public?

**MR. COHEN:** No.

**SENATOR COX:** Okay. Has any information that's been received based upon the letter that you sent out, the one where it says, if you've ever committed a crime or anything, report it to us...has that been reviewed by non-department staff?

**MR. COHEN:** No.

**SENATOR COX:** None of the materials have been reviewed or shared with outside counsel?

**MR. COHEN:** No.

**SENATOR COX:** Okay.

**MR. COHEN:** And believe it or not, we did have two companies come forward and admit to conduct that was clearly in violation, as they acknowledged.

**CHAIR SPEIER:** And what happened to them?

**MR. COHEN:** We are in negotiations with both.

**CHAIR SPEIER:** So, nothing has happened.

**MR. COHEN:** Not yet, but it will.

**SENATOR COX:** So that's in response to question number seven which said *Has your company or any of its employees or producers conducted or otherwise been involved with inappropriate solicitation activities? If so, please provide details of such requests.*

**MR. COHEN:** We have gotten at least two, that I'm aware of, responses that were affirmative, yes.

**SENATOR COX:** Okay. How many responses did you get, Mr. Cohen?

**MR. COHEN:** I don't have that figure.            **G&C 00751**

**SENATOR COX:** How many letters did you send?

**MR. COHEN:** It was in the hundreds.

**CHAIR SPEIER:** You sent hundreds of letters out?

**MR. COHEN:** Yes.

**SENATOR COX:** One hundred, 200?

**MR. COHEN:** I honestly don't know, but I can get you that information.

**SENATOR COX:** All right. And how many responses did you receive?

**MR. COHEN:** The responses, we generally received responses. There were a few cases where we didn't receive responses and we pursued by means of subpoena.

**SENATOR COX:** Would you just provide the committee with the number of letters that you sent and responses you received, and the number of subpoenas that you issued?

**MR. COHEN:** Absolutely.

**CHAIR SPEIER:** Can you provide the committee with the actual lists of those that you sent the letters to?

**MR. COHEN:** Sure.

**CHAIR SPEIER:** Okay. And in hindsight, do you think this was a good exercise?

**MR. COHEN:** At the time we were getting, there was a great deal of interest at the national level, at the NAIC, to get handle on how broad this problem was. And so I would say, for purposes of ascertaining the answer to that question, it was useful. For purposes of bringing enforcement actions it was too many to be useful for purposes....I mean, I take the Senator's point, that being more focused, if you're purpose is to get at just the few bad guys, is the better way to go.

**CHAIR SPEIER:** How many people do you think you dedicated to this project?

**MR. COHEN:** There were two lawyers who had been working on it, and then we were fortunate for a lot of just the review of the data, we were able to use law students who were unpaid interns.

**CHAIR SPEIER:** You had law students?

**MR. COHEN:** Yeah.

**CHAIR SPEIER:** Okay.

**MR. BAUM:** We don't pay them.

**MR. BANDA:** Right.

G&C 00752

**CHAIR SPEIER:** All right. Well, this takes us to investigations. Because I have a particular interest in SB 940, as you might recall, and part of why we added the 20 cents to the premium was so that the backlog at the department could be addressed. It was with some dismay that I read your response, which suggests that under existing resources, resources that you, in some respects diverted to this other project, was it not....you didn't have the same people working. This is the same division though, is it not?

**MR. BAUM:** I'm sorry. You're talking about the legal division?

**CHAIR SPEIER:** It's all investigations, though, isn't it?

**MR. BAUM:** I'm unclear as to what you were talking about.

**CHAIR SPEIER:** The letter that you sent out to a number of the eight...

**MR. BAUM:** My understanding was, that the lawyers...

**UNIDENTIFIED:** That was only legal.

**CHAIR SPEIR:** That was only legal. All right. So 20 cents dedicated to getting rid of the backlog. Your response to the committee's analysis was that the present rate, you won't have that accomplished for six years.

**MR. BANDA:** I can comment on that, Madam Senator.

**CHAIR SPEIER:** Okay.

**MR. BANDA:** The original backlog of cases in 2000 was approximately 4,000, thereabouts. And then there was a re-looking at those particular cases, and a lot of the cases were agents and brokers that had multiple complaints, so it was condensed down to 3,116, thereabouts. That was just all the cases. The 940 cases were actually....were a 385 and now we've moved them down all the way to 67, which is an 83 percent decrease. And when we looked at the amount of average hours put on an investigation and tried to factor that to what we could get that particular caseload down to zero while maintaining the continuous flow of the cases that still come in the door monthly, we determined the three investigators and a limited term, three investigators for three years, would be able to reduce the backlog down to zero and still maintain the inflow of complaints coming in.

**CHAIR SPEIER:** Well, I believe you, but why would you then tell the auditor in response to her review, that it was going to take you six years? Go to page 22 of the backgrounder. In bold and about halfway down, is the response that was given to the auditor. It's actually the auditor's comment on your report, that it was going

to take six years.

**MR. BANDA:** Well, I was the prior division chief that was commandeering this, and I'm familiar with this, is that there was a continuous flux of cases coming in and that we didn't want to start reducing the actual investigator hours and then have the backlog start to go up again. So they factored in that, I believe this being six years. I think we're talking about actual PYs (personal years) as opposed to calendar years, of projecting out six years.

**CHAIR SPEIER:** So it's going to take you a few months now?

**MR. BANDA:** What I'm saying is, is that with the additional investigators, I think we're applying investigative hours rather than calendar years. In other words, we believe that we can increase, investigate more.

**MR. BAUM:** The answer to your question is, over the next three years.

**CHAIR SPEIER:** Three years.

**MR. BAUM:** Over the next three years, the 67 that is currently outstanding will be reduced to zero. And during that three year period, all incoming complaints and issues will be dealt with such that there is not an increased backlog. So you're going to look....the backlog is currently at 67. It will reduce over the next three years and there will not be....it will not increase, so that there will be no backlog by the end of the three year period, plus we will be dealing with all of the inflow. Now, if that inflow is less, the 67 goes down more quickly.

**CHAIR SPEIER:** You know, the auditor was, I guess, alarmed by the fact that 43 percent of the open cases have been opened and unassigned for more than six months. It would seem to me, with your new IT capabilities, that that shouldn't happen at all.

**MR. BAUM:** Well, the IT capabilities aren't fully in yet. But as far as I'm concerned, that's the whole point of the IT capabilities. Is to ensure that does not continue.

**MR. BANDA:** Madam Chairwoman, just to....we additionally created a directive that supervisors will review cases on a quarterly basis. I believe that there is a continuous need to review the cases and the backlog; determine whether there is additional information; and reprioritize if the cases do need to be investigated if there's other complaints that nature coming in. So we did, since the auditor's report, institute a directive for a quarterly review of those cases. **G&C 00754**