**CHAIR SPEIER:** And these cases for the most part are cases, complaints, that have been filed about insurance agents and brokers—is that right?

**MR. BANDA:** Correct.

**CHAIR SPEIER:** And typically is the vast majority of them in auto? And as these cases stand unaddressed, these individuals continue to offer insurance products—correct?

**MR. BANDA:** What we try to do is, we do work with legal in that we will talk with our legal staff to determine whether or not we can do a warning letter, we can do a cease and desist, we can do other methods to stop the behavior, and even including contacting that particular licensee depending on how egregious the action is. So we have been trying to make sure that we target the biggest area, or the biggest offenders.

**CHAIR SPEIER:** But as a consumer there is no way for me to find out if my particular agent is being investigated, is there?

**MR. BANDA:** I believe that there is. When you go to the department's website, I believe that there is some filings there of agents that have had some disciplinary action against them.

**CHAIR SPEIER:** But that's subsequent. These have not been investigated.

**MR. BAUM:** Obviously, for all the appropriate reasons, we're not going to post somebody's name who is in the process of being investigated because the investigation could...

**CHAIR SPEIER:** Right. Due process requires us to allow that to happen. But it does beg the question, if this goes on even for three years...

**MR. BAUM:** The issue I think you're raising, is the urgency of trying to get these done because the individual....if in fact a bad apple, to the extent that we're not getting that investigation completed, that person is continuing to operate. And that's why we've done two things.

First of all, we have restructured the division under Mr. Banda's leadership. We have also dropped the caseload to where it is today. And our goal is to....and all of those 67 cases are being reviewed, and they're constantly prioritized. And one of the things that occurs is, that we have ongoing complaints. So if somebody who is in that 67 gets a complaint, that moves immediately to a higher priority. But we're still working on those to get rid of them.

G&C 00755

**CHAIR SPEIER:** I bring it to your attention because we're going to find a similar problem in the Department of Corporations, where for over ten years, they were receiving complaints about a particular company that was out there fleecing consumers with various financial products. And I don't think we can underscore enough, this is one of the most important functions of your department. And to have complaints that are as stale as they have been, and the backlog that existed as long as it has, even with the augmentation of funding, is not good. And if you can find a way of reducing this backlog to a year and come up with a proposal to present to the committee that's reasonable, we'll take it up.

**MR. BANDA:** We appreciate that and we, again, I accept and agree with your conclusion, that even if there's one person out there who we're still studying, who is continuing to operate because we're studying that individual, that's unacceptable and we need to get that down.

**SENATOR COX:** When you find that particular situation either with an agent or a broker, what is your action with respect to the....I understand you move it up higher on the priority and you begin your investigation or increase your investigation, what do you do with respect to the company for which the individual is transacting the business? Do you notify them saying look, we think we have an alarming pattern here that you need to know about; you're potentially on the hook for all this? What's your action?

**MR. BANDA:** Well, there's two routes you can do on these type of allegations. One is, administrative, the other is criminal. So we work with our legal staff because there is a remedy to stop the behavior immediately. The other is to go to the district attorney....there's two concurrent investigations going on. As well, we'll notify the insurance company, depending on what type of activity is going on. A lot of times it depends on what type of agent—whether it's a captive, or if it's an independent, or broker. That determines a lot of factors in our investigation.

**SENATOR COX:** Well, you have the ability to suspend their license.

**MR. BANDA:** We do do that. We have the ability to do an action against the license.

**MR. BAUM:** We do, but that's part of the whole investigation. That's what we're about. I'm assuming that's what Senator Speier was asking.

**SENATOR COX:** But the Senator is also talking about the fact that there, for

G&C 00756

lack of a better term, that doesn't seem to be the urgency that is required in order to protect the consumer. I mean, an agent can't for very long book the risk themselves. You know, sooner or later you've got to have a claim and you've got serious problems. So it just seems to me that the Senator is absolutely right, there needs to be a greater degree of urgency than the department appears to be exercising.

**CHAIR SPEIER:** Why don't you do this—why don't you provide to the committee a listing, not by name, but of these complaints that have been filed and what the conduct is that they're being charged with, so that we can get a sense of the level of criminal behavior, or public risk.

**MR. BAUM:** The nature of the violation.

**CHAIR SPEIER:** Right. And then, we can make some assessments as to how we can get through this backlog—okay.

**MR. BANDA:** We'll do that.

**CHAIR SPEIER:** All right. And get that to _____. Thank you.

I think we now move to our final topic—financial surveillance. Ramon Calderon is here to speak.

Good afternoon, Mr. Calderon.

**RAMON CALDERON:** Good afternoon, Senator.

**CHAIR SPEIER:** Now, don't make a liar out of me. I said we weren't going to be here until three, so.

**MR. CALDERON:** I'll do all I can to help in that.

**CHAIR SPEIER:** All right. Do you have anything that you want to present to us before we get into this?

**MR. CALDERON:** No, I do not.

**CHAIR SPEIER:** No. Okay. So, let's look at the issue of reserves. Have you looked recently at....we had a flurry of concerns by insurers, maybe two years ago, about mold.

**MR. CALDERON:** Mold?

**CHAIR SPEIER:** Mold. And then, of course, there were many efforts to exclude mold. So is the mold issue one of concern to us today?

**MR. CALDERON:** Well, the mold issue was looked in terms of the overall reserve adequacy. In our financial examinations, we did not undertake a separate

analysis of the mold exposure, but only in terms of the overall reserve adequacy that a company may have for its homeowners insurance line of business.

**CHAIR SPEIER:** Well, but it was the thrust of a good part of the legislation over the last few years.

**MR. CALDERON:** Was your question related to rates, or is it related to...

**CHAIR SPEIER:** Well, I mean, it caused the rates to go up substantially. Then we had all the exclusion of mold. And I would think that part of what you would....maybe this doesn't fall under your area of responsibility. It may actually be in another area.

**MR. BAUM:** I think it was more of rate issue.

**CHAIR SPEIER:** But it does, to the extent that you have to reserve for mold, and that was the thrust of what most insurers were saying *We're dying under the mold cases*, and presumably they were reserving for the mold cases. So to the extent to which mold cases did not develop, then the reserves could be excessive—correct?

**MR. CALDERON:** That's correct.

**CHAIR SPEIER:** So how would you...

**MR. CALDERON:** Well, reserves are adjusted annually, or they can be adjusted quarterly, and you will always have excess reserves, or understated reserves, depending upon the line of business that you write. But I still think that your question is more directed at rates and how rating contemplates an excess reserve when you look at a rate application.

**CHAIR SPEIER:** Okay. I don't know that I absolutely agree with you, but I'll take your word for it.

One of the issues referenced in the backgrounder that had never really occurred to me before, was the fact that when reserves are excessive, it has the effect of being a financial shelter for an insurance company in terms of the corporate parent. Have you looked at that issue at all?

**MR. CALDERON:** Sheltering how?

**CHAIR SPEIER:** Well, if held by an insurance company that is a subsidiary to a corporation subject to California's Franchise Tax, excessive insurance company reserves could provide a corporate franchise tax shelter. For example, a parent company could use its insurance company's subsidiary to invest money and could

G&C 00758

shelter all of the investment growth from taxation. The money would not be subject to the Franchise Tax because it was not held by the parent corporation. It would also not be subject to the insurance gross premium tax, because the tax is based on premiums written, not assets held.

Over capitalization of insurance companies subsidiaries was the subject of the anti stuffing provisions of Assemblywoman Oropeza's bill that was chaptered in 2004, and, which presumably you are implementing.

**MR. CALDERON:** I believe you're referring to Assembly Bill 263.

**CHAIR SPEIER:** That's correct.

**MR. CALDERON:** And this is where the legislative analyst, in consultation with the Department of Finance and the Department of Insurance and the Franchise Tax Board, will undertake a study of the impact of this act.

If your question is, what is financial surveillance doing with regard to overcapitalization, the companies, we'd love to have companies that are overcapitalized. We tend to find just the opposite—companies that are barely capitalized to meet the level of business that is underwritten.

I understand the objective of the assembly bill. We are ready to assist the legislative analyst when it decides to undertake the study of the impact of this particular act.

**SENATOR COX:** But the question is, do you look at whether the reserves are under or over?

**MR. CALDERON:** Yes, we do, Senator.

**SENATOR COX:** And what do you find?

**MR. CALDERON:** We find some that are over and some that are under.

**SENATOR COX:** What do you do when you find companies that have over reserved based upon the risk?

**MR. CALDERON:** Well, what we find typically is that it's a question....it's an issue of their estimation process. There's not one insurance company that will ever be on the dollar. It will either be over, or it will be under. To the extent that companies are over reserved, they've established too much in their provision for losses, we take a look at that company again to see if whether it continues to use the same reserving methodology from year to year; we take a look at what its outside actuarial opining actuary may say with regard to the level of reserves; and we do our

G&C 00759

own internal assessment.

**SENATOR COX:** And you're familiar with the Senator's comments about stuffing?

**MR. CALDERON:** Yes, I am.

**SENATOR COX:** And how many stuffing cases do you see a year?

**MR. CALDERON:** I haven't seen any. For California domestics, I have not seen any.

**SENATOR COX:** In your career with the insurance commissioner's office, you've never seen a case of stuffing?

**MR. CALDERON:** I have seen over reserving.

**SENATOR COX:** But not stuffing?

**MR. CALDERON:** I'm not an expert on....this is a new assembly bill. It's just been in effect now for about a year. I'm not familiar with what particular impact it might have on any individual company.

**CHAIR SPEIER:** All right. So if there overcapitalization, what do you do?

**MR. CALDERON:** There isn't anything we do financially, if there's overcapitalization.

**CHAIR SPEIER:** Well presumably, either the premiums should go down...

**MR. BAUM:** Well, it depends. If it's a company that's....if a company is seeking a rate increase, then we're going to do the analysis that we normally do with respect to the rating of that company.

**CHAIR SPEIER:** Let's say they're not seeking a rate increase.

**MR. BAUM:** I think the struggle that Mr. Calderon is having here is, that our experience from a practical perspective is, that reserving is the series of estimates made by the company actuary, the department's actuary, and if we have a big dispute, a third actuary. And, usually all three of those are all around a particular number. Some are over; some are under; and some say....and a perfect example was the SCIF, where some actuaries said they were overcapitalized. We were saying they were under capitalized. And so, it's not....stuffing, I'm assuming, is where there is a such a grotesque difference, such a gross difference, between the capitalization needed and the business that's being written, that you have in effect, as you're saying, an example of an effort to truly avoid taxation. I think I'm hearing Mr. Calderon say, "We don't...

G&C 00760

**CHAIR SPEIER:** You haven't seen it.

**MR. BAUM:** We haven't seen that.

**CHAIR SPEIER:** All right. Let's talk about just the solvency of companies. Do we have any teetering on insolvency right now?

**MR. CALDERON:** Are you referring to California domestic companies?

**CHAIR SPEIER:** Yes.

**MR. CALDERON:** I would say not.

**CHAIR SPEIER:** Do we have any on a watch list?

**MR. CALDERON:** The department maintains its list of companies. Some companies, we pay closer attention to than others.

**CHAIR SPEIER:** Is there a watch list?

**MR. BAUM:** There is a watch list, which is the list he's talking about.

**CHAIR SPEIER:** All right. And is that public?

**MR. BAUM:** No, it is not public.

**MR. CALDERON:** No, it would not be.

**CHAIR SPEIER:** Okay. So, how many companies are on this watch list right now?

**MR. CALDERON:** Probably in the range of 20 companies.

**MR. BAUM:** The watch list rate has three gradations of companies. And the top gradation would be what you described as teetering on insolvency.

**CHAIR SPEIER:** And how many would you say are in that category right now?

**MR. CALDERON:** Less than ten.

**MR. BAUM:** Yes. And you're asking about California domestics specifically, and I think the answer is none—right?

**MR. CALDERON:** You have teetering on insolvency, I would say none.

**CHAIR SPEIER:** All right. So, holding their breath.

**MR. CALDERON:** Well, they're on our list of priority companies for various reasons.

**CHAIR SPEIER:** I want to get a sense of how many we're talking about. Let's say for discussion purposes, they're ten. You said ten, instinctively. There are ten companies that need to be watched carefully. What are you doing? How many PYs are you, kind of, setting aside to observe that? We have gotten caught a number of

G&C 00761

times, historically now, where it was way too late and you couldn't bring them back from insolvency. And I want to have a sense that we're on top of it this time.

**MR. BAUM:** Sure. Mr. Calderon will go right through that process. But again, I wanted, so we're clear, of that ten, the substantial number of them are probably companies domesticated outside of the state of California. We still watch them. But he's going to describe the process for watching those as well as watching the California domestics. Because both of them do business in California.

**CHAIR SPEIER:** Correct.

**MR. CALDERON:** Just very quickly. I have a staff of approximately 120 insurance examiners. Roughly half of them are devoted to on sight financial examinations, and the other half are devoted to desk reviews. And in addition to that we have, within the financial surveillance area, what we term to be an early warning team of analysts, attorneys, and other folks within the department that help monitor companies that have been identified as the highest priority companies.

When you asked the question about how many PYs do we have dedicated toward that—it is whatever it requires. If we were to have 50 companies that were designated as high priority companies, we would move the analyst and the examiners to focus on those 50 companies. Yes, the early warning team does have a set number of examiners that support that, and it does have a set number of management folks, but it is a dynamic sort of relationship. The more problem companies, priority companies we have, the more we dedicate in terms of resources.

**CHAIR SPEIER:** So you have adequate resources to do the job from your perspective—right?

**MR. CALDERON:** For the priority companies, yes.

**CHAIR SPEIER:** And do you have an inadequate supply of staff for any other purpose?

**MR. CALDERON:** Well, we have a very few number of actuaries. As you probably are aware, it's very difficult for most departments, state agencies, to attract qualified actuaries. And in that scenario that we have struggled with over a number of years, actually we've been pretty fortunate—we've hire two actuaries in the last six months. And that's a matter more of chance than in recruitment efforts, believe me.

With regard to the analyst, from time to time, on special projects, we do need

G&C 00762

additional analysts, but we're able to simply dedicate the resources based upon the prioritization of issues.

**CHAIR SPEIER:** Okay.

**SENATOR COX:** Can you talk about, just for a moment, the model that the department employs with respect....because I looked at the data in the industry. It appears that many of the insurance commissioner and their offices, the insurance commissioner's office, has a significantly fewer number of attorneys than California. It appears that they have adopted a different model that relies more on actuarial folks. As a matter of fact, it was in the 2003 insurance resources department put out by the National Association of Insurance Commissioners. And when you go through it...

**CHAIR SPEIER:** You don't like reading novels, I can tell.

**SENATOR COX:** You know, I've read a pretty good one recently. But it seems...

**MR. BAUM:** That's after he read that.

**SENATOR COX:** _____ kind of document that if you have insomnia, you just start reading it. But it seems to me that the model that we've employed here in California is one that has an over reliance on attorneys and a lesser reliance on actuarial.

**MR. CALDERON:** I let our general counsel respond to the attorneys.

**CHAIR SPEIER:** Okay. You respond from your perspective.

**MR. COHEN:** I'll have to study the report.

**CHAIR SPEIER:** Well, from your experience, I mean, it sounds like you're suggesting that we need more actuaries.

**MR. CALDERON:** Oh, absolutely. I don't know the comparison that you're making between actuaries and attorneys, because they do different work. The attorneys, I can tell you the relationship that there is between attorneys and the Financial Surveillance Branch. The attorneys will support the staff on every corporate application matter that comes before the department, and also supports the staff on any interpretive issues dealing with the insurance code.

**SENATOR COX:** It appears to me, Madam Chair, as I look at this data that's being supplied, we have 87 attorneys and 44 staff people. That was in 2003. And so when you go take a look at...

G&C 00763

**MR. BAUM:** That would be the legal department, I think you're talking about—right.

**SENATOR COX:** I'm just inquiring. It appears to me that the model is significantly different in California than in every other state in the United States.

**MR. CALDERON:** My understanding of how other states work is fairly similar to how our department is structured—fairly similar. I hope you're comparing New York to California and not California to Iowa.

**CHAIR SPEIER:** No, we're not. This is kind of interesting. I haven't seen this. So, New York has 31 lawyers and 12 support; we have 87 and 44. The closest one, actually, is Florida, with 59 and 46. Something for you to ponder. Not to mention our outside contract attorneys.

Actuaries, let's just look at actuaries just a second. California has, it looks like, eight actuaries.

**MR. CALDERON:** That's correct.

**CHAIR SPEIER:** And let's look at New York. They have 40.

**MR. BAUM:** They're more expensive too.

**CHAIR SPEIER:** And Florida has 10. So, the two states that come closest to us with attorneys, have more than we do in terms of actuaries. It's probably an area that we should look at.

**SENATOR COX:** I think so.

**CHAIR SPEIER:** Okay. Anything else?

**MR. CALDERON:** No.

**CHAIR SPEIER:** Okay, one last question I have is on SCIF. I don't know if that's to you, or....well, actually it would be to you in terms of their financial liability. How does it stand today?

**MR. CALDERON:** SCIF is doing better today than it was at year end 2004. It continues to post record profits. SCIF's surplus has grown. In this year alone, approximately $600 million. Actually, and I'm referring to June 30th, so it's grown even more since then.

**CHAIR SPEIER:** So maybe as much as a billion dollars by year end?

**MR. CALDERON:** For 2005, more likely than not, close to a billion dollars.

**CHAIR SPEIER:** So this issue of deficiency in reserves is no longer an issue?

**MR. CALDERON:** When you say it's no longer an issue, it continues to be an

issue of discussion. It continues to be an issue of further analysis. We have continued to retain an outside consultant, the one that's being used with SCIF for a number of years to closely monitor the reserves for SCIF, to meet with SCIF's opining actuary, and to meet with SCIF's internal actuarial folks, as well. We've also met with SCIF's independent accountants on that same matter.

**MR. BAUM:** I think the short answer is, that the reserving situation has been improving. We're comfortable with the direction it's going in, and we don't' have the kind of urgency that we met in your office about two years ago.

**CHAIR SPEIER:** So two years ago was about a $2 billion reserve inadequacy—is that right?

**MR. BAUM:** I want to say about a billion, actually.

**CHAIR SPEIER:** So like a billion-and-a-half. All right. So to the extent to which you are now going to have more than a billion generated this year, you've got to be close to where you need to be—right?

**MR. CALDERON:** Well, the assumption is, that if you take the profits to help absorb whatever deficiencies there were in years past, you're correct. But the remaining question is, are they reserving for their current business adequately? It continues to be a very dynamic analysis. You just can't look at prior years and say it's all resolved.

**MR. BAUM:** Part of it is, as the new business goes forward, we're pleased that there's competition out there. We're seeing that. And it is clearly impacting rates so that we're seeing better rates with that competition. But then that means different books of business will be leaving SCIF, and they have to adjust to that. And so that's why it is….Ramon says, it's a bit fluid and we have to constantly look at it.

**CHAIR SPEIER:** Do you happen to know what percentage of the market SCIF has right now?

**MR. CALDERON:** It's gone under 50 percent. SCIF, in my recollection…

**CHAIR SPEIER:** And at its high it was at 60?

**MR. CALDERON:** A little over 50.

**CHAIR SPEIER:** A little over 50.

**MR. BAUM:** Yeah, I think it was as high as 55.

**MR. CALDERON:** My recollection is that SCIF, it will be writing about a

G&C 00765

billion dollars less this year than it did last year, and that's probably a sign of competition. New entrants have come into the market and taken some of the business that used to be written by SCIF to themselves. That only brings up other issues.

**CHAIR SPEIER:** Which are?

**MR. CALDERON:** Which are, what is typically known as potentially adverse selection. Meaning, that your bad book of business remains with SCIF, and the good guys, the policyholders that have few losses, go to the other companies that give them more attractive rates.

**CHAIR SPEIER:** But that's always been in issue for SCIF. It's always been the insurer of last resort for....it was created for that purpose, actually.

**MR. BAUM:** From our perspective, it's an underwriting question and we just want to be real sure that they're underwriting. And if you recall during the crisis, it was, in a sense, a failure of underwriting that resulted in the disconnect between the liabilities they took on and the premium they were getting.

**CHAIR SPEIER:** Okay. All right. Well those complete my questions. Senator Cox?

**SENATOR COX:** Thank you, Madam Chair, for holding this hearing. Perhaps we can get together in the next week or so and decide whether it's necessary to have an additional...

**CHAIR SPEIER:** All right. You just love to have oversight hearings on the Department of Insurance, I think.

All right. Thank you all for joining us. We appreciate the support of the Department of Insurance staff and for Commissioner Garamendi's appearance, as well. Thank you.

-oOo-

G&C 00766